**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00070-CV**

_____

**ROCKLON, LLC, Appellant**

**V.**

**BEVERLY PARIS AND DANIEL PARIS, Appellee**

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-196,826**

**MEMORANDUM OPINION**

Appellant Rocklon, L.L.C. ("Rocklon") appeals a temporary injunction granted in favor of Daniel Paris and Beverly Paris, individually and as the personal representative of the Estate of Kristin Paris (collectively "Paris").[1] We affirm the trial court's temporary injunction.

_____

[1] Beverly Paris is Kristin Paris's mother, and Daniel Paris is her father.

1

# I. Background

Paris filed a wrongful death and survival action against Rocklon, Rockal, Inc. ("Rockal"), Rockline George Kennedy ("Kennedy"), Winrock Investments, Inc. ("Winrock"), and Thomas Sherlock ("Sherlock"), alleging that the defendants were responsible for Kristin's death.[2] According to Paris's pleadings, on January 26, 2015, Kennedy went to a bar and strip club named Dream Street, which was owned, operated, licensed, maintained, and staffed by Kennedy and the various other defendants. Paris alleged that Sherlock served Kennedy alcohol and continued to serve him alcohol after Kennedy was obviously intoxicated. Sometime thereafter, according to the pleadings, Kennedy left Dream Street and, at some point, entered the westbound lanes of the highway traveling eastbound against traffic when he struck Kristin's vehicle head on, causing her death. Evidence in the record reflects that Kennedy pled guilty to intoxicated manslaughter and was sentenced by a jury to eighteen years in prison.

Paris amended her petition twice, and in so doing, named Ruston Ray Kennedy ("Ruston") as a defendant and alleged violations of the Texas Uniform Fraudulent Transfer Act against all defendants, including Rocklon. Paris alleged

---

[2] Rocklon is the only defendant in the underlying lawsuit that filed a notice of interlocutory appeal of the trial court's injunction order. Thus, the other defendants are not parties to this appeal.

that Rocklon and Rockal are alter egos of Kennedy. Paris further alleged that Ruston participated in liquidating the assets of Rocklon after the commencement of this lawsuit and used the proceeds for his personal benefit.

Paris obtained a temporary injunction against Rocklon, which we reversed on appeal because the trial court's order failed to comply with Rules 683 and 684 of the Texas Rules of Civil Procedure. *See Rocklon, L.L.C. v. Paris*, No. 09-15-00245-CV, 2015 WL 6521227, at *1-2 (Tex. App.—Beaumont Oct. 29, 2015, no pet.). On remand, Paris filed another application for a temporary restraining order and temporary injunction. A temporary restraining order was entered, and the trial court held a hearing on Paris's request for a temporary injunction. In her request for a temporary injunction, Paris alleged that the defendants had disposed of assets belonging to Rocklon with the actual intent to hinder, delay, or defraud plaintiffs by placing Rocklon's assets out of Paris's reach in the event of a judgment against Rocklon. Specifically, Paris argued that Rocklon sold the bulk of its assets eight days after Kennedy filed his answer to this lawsuit. The asset Paris specifically complained about was real property located at 5980 South MLK Parkway in Beaumont, Texas (the "MLK Property"). At the conclusion of the injunction hearing, the trial court once again entered a temporary injunction against Rocklon. The trial court's order enjoined Rocklon, its officers, agents, servants, employees,

3

attorneys, representatives, or any other person acting in concert or participation with Rocklon from "accessing, distributing, disbursing or removing any of the one million dollars . . . in proceeds from the disposition of [Rocklon's] sale of property and majority asset, or any remaining proceeds of such sale, and that such proceeds must remain in the Morgan Stanley banking account in which it currently sits[.]"

Rocklon filed a notice of interlocutory appeal. In two appellate issues, Rocklon contends the trial court abused its discretion by granting the temporary injunction because: (1) the temporary injunction improperly freezes Rocklon's bank accounts for the sole purpose of ensuring there is money to pay a judgment if Paris is successful at trial; and (2) the injunction is not supported by competent evidence.

## II. Standard of Review

We review a trial court's decision to grant a temporary injunction for an abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). We must not substitute our judgment for the trial court's judgment unless the trial court's judgment was so arbitrary that it exceeded the bounds of reasonable discretion. *Id*. We review the evidence in the light most favorable to the trial court's judgment and draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *Cameron Int'l Corp. v. Guillory*, 445

4

S.W.3d 840, 845 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We will not find an abuse of discretion if the trial court heard conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Dallas Anesthesiology Assocs., P.A. v. Tex. Anesthesia Grp., P.A.*, 190 S.W.3d 891, 896 (Tex. App.—Dallas 2006, no pet.). The trial court abuses its discretion when it misapplies the law to the "established facts or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery." *State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex. 1975). Our review is limited to the validity of the trial court's temporary injunction order, and we will not consider the merits of the underlying case. *Cameron*, 445 S.W.3d at 845.

### III. Evidence Supporting Temporary Injunction

In its second issue, Rocklon challenges the sufficiency of the evidence to support the temporary injunction. Rocklon specifically argues that Paris failed to present evidence of a probable right to relief and of imminent harm. "A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Butnaru*, 84 S.W.3d at 204. To be entitled to a temporary injunction, the applicant must plead and prove a cause of action against the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim.

5

*Id*. It is the applicant's burden to produce some evidence that establishes a probable right of recovery. *Cameron*, 445 S.W.3d at 845; *see In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (quoting *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex. 1961)). However, the applicant is not required to prove that it will ultimately prevail at trial, only that it is entitled to preservation of the status quo pending trial on the merits. *Cameron*, 445 S.W.3d at 845.

## A. Probable Right of Recovery

An applicant shows a probable right of recovery by alleging a cause of action and presenting evidence tending to sustain the cause of action. *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.). Rocklon contends Paris failed to present sufficient competent evidence supporting a probable right to recover on her claims. According to Rocklon, there is no evidence that Rocklon is liable to Paris on the underlying claims because there is insufficient proof to establish that Rocklon is an alter ego of Kennedy, and there is no evidence of a fraudulent transfer. We address Rocklon's contentions in turn below.

The Texas Uniform Fraudulent Transfer Act ("TUFTA" or the "Act") is contained in chapter 24 of the Texas Business and Commerce Code. *See* Tex. Bus.

6

& Com. Code § 24.001 (West 2015), § 24.002 (West Supp. 2015), §§ 24.003–24.013 (West 2015). The purpose of TUFTA is to prevent debtors from prejudicing creditors by improperly moving assets beyond the creditors' reach. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). TUFTA defines a "creditor" as "a person, including a spouse, minor, person entitled to receive court or administratively ordered child support for the benefit of a child, or ward, who has a claim." Tex. Bus. & Com. Code Ann. § 24.002(4). A "claim" is "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id*. § 24.002(3). A "debtor" is "a person who is liable on a claim." *Id*. § 24.002(6). TUFTA creates an independent cause of action by which a creditor may seek recourse for a fraudulent transfer of assets or property. *Blackthorne v. Bellush*, 61 S.W.3d 439, 443 (Tex. App.—San Antonio 2001, no pet.). Subject to applicable principles of equity and in accordance with the Texas Rules of Civil Procedure, section 24.008 of TUFTA specifically provides that in an action for relief under the Act, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[.]" Tex. Bus. & Com. Code Ann. § 24.008(a)(3)(A). Here, Paris alleged

7

TUFTA claims against all defendants, including Rocklon. Paris also alleged that Rocklon is an alter ego of Kennedy and, as such, is a debtor under TUFTA, and had fraudulently transferred or was "highly likely" to fraudulently transfer its property and assets with an actual intent to hinder, delay, or defraud Paris.

## 1. Alter-Ego Relationship

Rocklon argues that Paris has no probable right to recover on her claims against it because Rocklon is not an alter ego of Kennedy. To address this issue, we must determine whether there was any evidence submitted to the trial court that an alter ego relationship existed between Rocklon and Kennedy such that Rocklon's assets may be used to satisfy Kennedy's liabilities. Although the Texas Supreme Court has not definitively addressed this issue, Texas intermediate courts of appeal and other jurisdictions have applied to limited liability companies ("LLCs") the same state law principles for piercing the corporate veil as they have applied to corporations. *See Shook v. Walden*, 368 S.W.3d 604, 614, 621 (Tex. App.—Austin 2012, pet. denied); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.); *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see also Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013) (explaining that Texas law provides that veil-piercing and "alter ego" principles

8

apply equally to corporations and LLCs); *Key v. Richards*, No. 03-14-00116-CV, 2016 WL 240773, at *3 n.4 (Tex. App.—Austin Jan. 13, 2016, no pet.) (acknowledging that the legislature has broadly insulated LLC members from liability for an LLC's obligations, but refusing to find without clear direction from the Supreme Court that this insulation nullifies the longstanding common law establishing that corporate agents are liable for their own tortious conduct and may even be liable for an entity's liabilities based on the equitable principles of veil-piercing). Here, Rocklon does not challenge Paris's contention that veil-piercing theories are applicable to LLCs. Rather, Rocklon argues that Paris has failed to present evidence to support her reverse-piercing theory.

Under a "reverse[-]piercing theory" a creditor seeks to apply the alter ego doctrine in reverse, i.e.—"to hold a corporation's assets accountable for the liability of individuals who treated the corporation as their alter ego." *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 243-244 (5th Cir. 1990) (applying Texas law and concluding that Texas would allow a creditor to reach the assets of a corporation when there is a showing that an alter ego relationship exists between the individual debtor and the corporation). The ultimate goal in a reverse-piercing case is not only to hold the shareholders accountable, but to treat the individual and the corporation as one and the same. *Id*. "Upon a sufficient showing that the

9

corporation is the alter ego of the debtor, the corporation is treated as the debtor and its property may be attached . . . ." *Id*. at 244 (internal citation omitted).

Generally, basic veil-piercing alter ego principles apply to reverse-veil-piercing situations. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 481-82 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see Zahra*, 910 F.2d at 243-244. The Texas Supreme Court has explained that the alter ego theory forms a basis for disregarding the corporate fiction "where a corporation is organized and operated as a mere tool or business conduit" for another entity. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (superseded on other grounds by Tex. Bus. Orgs. Code Ann. § 21.223 (West 2012)) (internal citation omitted). Disregarding the corporate fiction is an equitable doctrine in which Texas courts take "a flexible fact-specific approach focusing on equity." *Id*. at 273. Essentially, this doctrine applies when the unity between a corporation and an individual is such that the "separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Id*. at 272.

In making the determination of whether an alter ego relationship exists, a court looks at the total dealings of a corporation and the individual and considers the degree to which corporate and individual property have been kept separately, the amount of financial interest, ownership, and control the individual maintains

10

over the corporation, and whether the individual used the corporation for personal purposes. *Cappuccitti*, 222 S.W.3d 481. The court may also consider whether corporate debts were paid with personal checks or other evidence of the commingling of funds. *Id*. at 482. Evidence that an individual made representations that he would financially back the corporation and evidence that an individual diverted company profits to himself for personal use is evidence tending to support a finding of an alter ego relationship. *Id*. Finally, the court may consider whether the corporation is inadequately capitalized. *Id*. The rationale behind the alter ego theory is that if the shareholder disregarded the separateness of the corporation, then the law will also disregard it in so far as it is necessary to protect creditors. *Castleberry,* 721 S.W.2d at 272.

It is not our function in this interlocutory appeal to determine the merits of Paris's alter ego claims. *See Cameron*, 445 S.W.3d at 845. In circumstances like this, where the trial court heard conflicting evidence, we will not find an abuse of discretion if the evidence in the record reasonably supports the trial court's decision. *See Dallas Anesthesiology Assocs., P.A.*, 190 S.W.3d at 896.

**a. Ownership Interest and Control of Rocklon**

In response to the allegation that Rocklon is the alter ego of Kennedy, Rocklon maintains that it is merely a real estate business that leased property to

11

Rockal, the company that owned Dream Street, and that there is no evidence that it "owned, ran or managed [Dream Street], or any establishment where alcohol was served." Rocklon asserts that it is owned solely by Ruston and not Kennedy.

It is undisputed in this case that Rocklon is organized as a Texas LLC. A certificate of formation is used to form an LLC, and it controls the overall organization and operation of the company. *See* Tex. Bus. Orgs. Code Ann. §§ 3.005, 101.051 (West 2012), § 101.052(d) (West Supp. 2016). The company agreement governs the relations among members, managers, and officers of the company, assignees of membership interests in the company, and the company itself. *Id*. § 101.052(a)(1). The company agreement may contain any provisions for the regulation and management of the affairs of the LLC so long as those provisions are not inconsistent with the law or the certificate of formation. *Id*. § 101.052(d).

Ownership of an LLC is essentially in the membership of the company. *See Id*. § 1.002(53)(A), (54), (63)(C) (West Supp. 2016) (defining the terms "member", "membership interest", and "owner"); § 101.052(b) (providing that to the extent the company agreement of an LLC does not provide otherwise, Title 3 (LLC provisions of the Code) and the LLC provisions of Title 1 govern the internal affairs of the LLC); § 101.106(a) (West 2012) (providing that members hold a

12

personal property interest in the LLC); § 101.251(2) (West 2012) (providing that members have a right to manage the operation of the LLC when the certificate of formation states that the company will not have managers). A "member" is a person who is a member or has been admitted as a member in the governing documents of the company. *Id*. § 1.002(53)(A). Generally, an LLC must have at least one member and may have more than one member. *Id*. § 101.101(a) (West 2012). Section 101.103 of the Business Organizations Code provides that a person becomes a member of the LLC in connection with its formation on the date the company is formed if the person is named as an initial member in the certificate of formation. *Id*. § 101.103(a) (West 2012).

A membership interest may be wholly or partly assigned, but the assignment of a membership interest in an LLC in and of itself does not entitle the assignee to participate in the management and affairs of the company, become a member of the company, or exercise any rights of a member of the company. *Id.* § 101.108 (West 2012). An assignee of a membership interest in an LLC is entitled to become a member of the company on approval of all of the company's members. *Id.* § 101.109(b) (West 2012). An assignor of a membership interest in an LLC continues to be a member of the company until the assignee becomes a member of the company. *Id.* § 101.111(a) (West 2012).

13

The trial court heard evidence that until 2006, Dream Street was owned and operated primarily by Winrock, which was a corporate entity whose stock was wholly owned by Kennedy. Sometime in 2006, Winrock was sued in a dram-shop case after a young man was killed. According to the uncontroverted evidence in the record, sometime after the 2006 lawsuit, Winrock filed bankruptcy and was eventually dissolved. Two new companies were subsequently created, Rockal and Rocklon.

Rocklon's Certificate of Formation, which was executed and filed with the Texas Secretary of State ("SOS") on February 1, 2006, indicates that Kennedy is the registered agent and only member of Rocklon. The certificate further indicates that at Rocklon's formation, its registered office was located at Kennedy's personal residence at that time—7713 Spring Meadow, Port Arthur, Texas. According to the SOS, Rocklon updated its records with the State at different times, and Kennedy remained Rocklon's registered agent, manager, and director. The SOS records reflect that Rocklon's address changed to Winzer Road in Beaumont, Texas, which also appears to have been the location of Kennedy's personal residence at that time. According to Rocklon's Certificate of Formation, Rocklon was organized as a member-managed LLC and would not have a non-member manager. As of

14

February 1, 2006, Kennedy was the only member of Rocklon. *See* Tex. Bus. Orgs. Code Ann. § 101.103(a).

There are two versions of Rocklon's Company Agreement in the record. Both versions were obtained as part of a document request from Rocklon's bank. Both versions indicate that Rocklon is a member-managed company and that "Members shall have the sole and exclusive control of the management, business and affairs of the Company, and the Members shall make all decisions and take all actions for the Company[.]" Both versions of the Company Agreement provide that members may designate an individual with authority to sign or give instructions with respect to bank and investment accounts. Both also provide that any notice, request, or consent to Rocklon or its members must be given to the members through Kennedy at his personal address.

For purposes of this appeal, the key distinction between the two versions is that one identifies Kennedy as the initial and only member of Rocklon. It is prepared for Kennedy's signature as the only member of Rocklon and is dated February 1, 2006. However, it is not executed. In contrast, the other version of the Company Agreement, which is advocated by Rocklon as the correct version, provides that Ruston is the initial and only member of Rocklon. The second document is executed by Ruston and is also dated February 1, 2006.

15

Also presented to the trial judge is a document titled, "Assignment of Membership Interest in Rocklon, LLC" (the "Assignment"). The Assignment purports to transfer all of Kennedy's ownership interest and membership interest in Rocklon to Ruston. The Assignment is executed by Kennedy and is dated February 1, 2006. Notably, both versions of the Company Agreement contain identical provisions regarding transfers of a membership interest. The agreement specifically defines an assignee as "a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member." Another provision states, "Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*." The Company Agreements also state that until an assignee becomes a substituted member in Rocklon, the assignee does not have voting rights and has no right to participate in the operations or management of the company. Further, an assignee is admitted as a substituted member only when the member making the transfer grants the assignee the right to be admitted and, among other things, the instrument assigning the membership interest contains an agreement by the assignee that he agrees to be bound by all of the terms and provisions of the company agreement. We note that the Assignment purporting to

16

transfer Kennedy's interest in Rocklon to Ruston does not contain such an agreement by Ruston, as the assignee. In fact, the Assignment is only signed by Kennedy and requires no agreement whatsoever by Ruston. The trial court could have reasonably determined that the Assignment failed to meet the requirements of the Company Agreements for a valid assignment and determined that it was void.

Additionally, there is a letter, dated June 5, 2006, which appears in the appellate record immediately before the Assignment and the second version of the Company Agreement. The letter is from an attorney, addressed to "Mr. Rocky Kennedy[,] Rocklon, LLC[,]" and indicates that the attorney is forwarding the "Company Agreement of Rocklon, LLC" and the "Assignment of Membership Interest in Rocklon, LLC" to Kennedy and Ruston for review and execution. In the letter, the attorney instructs Kennedy as follows: "Execute the Assignment of Membership interest where indicated and have Ruston execute the Company Agreement. . . . Please give me a call if you should have any questions." The letter is dated four months after Kennedy and Ruston purportedly executed the Assignment and Company Agreement. Ruston was questioned during the injunction hearing regarding the date the Assignment was allegedly executed. Ruston testified that he was not sure what date the Assignment was executed and refused to confirm or deny that it was signed on February 1, 2006. Considering all

17

the evidence and conflicts therein, the trial court could have determined that neither the Assignment nor the executed version of the Company Agreement were reliable to show the true membership or ownership of Rocklon.

Rocklon's Texas Franchise Tax Public Information Reports for various years are included in the record. In 2010, 2012, and 2013, Kennedy is identified as the only officer, director, or member of Rocklon.[3] However, Rocklon correctly states that the Tax Code, which creates this duty to report to the comptroller, does not expressly require an LLC to list all members on its Public Information Report. *See* Tex. Tax Code Ann. § 171.203(a)(3), (4), (5) (West Supp. 2015) (providing that an LLC shall file a report with the comptroller containing the name, title, and mailing address of each person who is an officer or director of the LLC on the date the report is filed; the name and address of the agent of the LLC, and the address of the LLC's principal office and principal place of business). Thus, Rocklon contends that the absence of Ruston's name on the form is not evidence to prove Kennedy's ownership. However, the forms instruct the LLC to list the "[n]ame, title and mailing address of *each* officer, director or member." (emphasis added). The forms

---

[3] Rocklon's 2014 Texas Franchise Tax Public Information Report is also included in the record. We note that the form is different from the forms used in 2010, 2012, and 2013. Relevant to the issues discussed herein, the form does not ask the LLC to identify its members. However, Kennedy is identified in the 2014 report as the manager of this member-managed LLC. Ruston is not mentioned in the report.

also identify Kennedy as the manager of Rocklon, which according to the provisions of Rocklon's governing documents, supports that Kennedy was also a member. The trial court could have reasonably interpreted these documents as some evidence that Kennedy was at least the managing member of Rocklon at the time the documents were filed. The court could have also considered the fact that Ruston was not identified in the forms in determining Ruston's role, if any, in Rocklon.

The trial court heard additional conflicting evidence regarding the formation and ownership of Rocklon. Ruston testified that Kennedy's only participation in the formation of Rocklon was as a guarantor for the loan Rocklon needed to purchase the MLK Property. Ruston testified that he had been the owner of Rocklon "since the very beginning." This testimony appears to be in direct conflict with Rocklon's Certificate of Formation, which identified Kennedy as the only member of Rocklon upon Rocklon's formation. Now, on appeal, Rocklon acknowledges that Kennedy was identified as the initial member of the company when the certificate of formation was filed with the Texas Secretary of State, but that Ruston executed the Company Agreement listing him as the sole member and accepted an assignment of membership interest in 2006. Rocklon argues that Paris

"purposefully ignore[s] the fact that [Kennedy] executed an assignment of interest to Ruston almost immediately after the company was formed."

Rocklon's arguments on appeal appear to conflict with Ruston's testimony and position in the trial court that he was always the sole member of Rocklon, and Kennedy had nothing to do with the formation of Rocklon, save acting as a guarantor of a loan. Ultimately, the trial court could have discredited Ruston's testimony that he had owned Rocklon from its inception. Not only does the Certificate of Formation conflict with Ruston's testimony, but if as Ruston argues, he owned Rocklon from its inception, Kennedy would have had no ownership interest to later assign to Ruston.

Financial records admitted into evidence from Rocklon's bank tend to support the contention that Kennedy was the sole member of Rocklon and had full control of Rocklon's bank account. Included in the appellate record is an untitled document, which appears to be the account signature card Kennedy completed to open a checking account for Rocklon. The document indicates that Rocklon is the owner of the account, and it lists Kennedy's personal address as the address for Rocklon. According to the document, Kennedy opened Rocklon's checking account on February 7, 2006. Kennedy's signature is the only authorized signature

20

on the account, and Kennedy is identified as the president of Rocklon.[4] Absent from the signature card is any reference to Ruston. Ruston testified at the injunction hearing that he had the account set up this way because he was young, had no experience running a business, and trusted Kennedy to handle the account. Based on the evidence in the record, Ruston did not receive authority to sign checks for Rocklon until soon after the collision involving Kristin. Before that time, the record supports that Kennedy signed all deposit slips, wrote all checks, and essentially handled all matters with the bank for Rocklon. Rocklon's checks even identify Kennedy's personal residence as the address for Rocklon.

On June 19, 2006, Kennedy applied for a real estate loan on behalf of Rocklon. The "Loan Worksheet" identifies Rocklon as the borrower and Kennedy as the "maker" of the note, as well as the guarantor of the note. The worksheet is dated over four months after Kennedy purportedly transferred all of his membership interest in Rocklon to Ruston, there is no reference to Ruston on the worksheet, and Kennedy is identified as a "member" of Rocklon. According to the worksheet, Kennedy pledged not only the MLK Property as collateral to support the loan, but also a personal life insurance policy.

---

[4] Six months later, Ruston represented in a lease agreement that Ruston was the president of Rocklon.

Another loan document included in the record also indicates that Kennedy was a member of Rocklon and the sole guarantor of Rocklon's note with the bank. This document, dated June 7, 2006, also postdates Kennedy's alleged full assignment of his membership interest in February by over four months. Kennedy also executed a Confidential Financial Statement for the bank on February 21, 2006. In the statement, Kennedy indicates he is the owner of Winrock and the sole officer of Rocklon.

Within the bank records is a document titled, "Resolution[.]" The Resolution was executed on June 19, 2006, but contrary to Kennedy's representations in the other loan documents that he was a member of Rocklon, the Resolution, signed only by Ruston, represents to the bank that only Ruston was a member of Rocklon. Ruston certified that Rocklon adopted a resolution authorizing Rocklon to execute a promissory note to the bank in the amount of $270,000, which was to be personally guaranteed by Kennedy and secured by a deed of trust covering the property. The Resolution purports to authorize Ruston, on behalf of Rocklon, to execute the note, deed of trust, and any other security instruments required by the bank. Also included in the appellate record is a Special Warranty Deed dated June 19, 2006, and executed by Ruston on behalf of Rocklon as its "Sole Member[.]"

22

Ruston testified that Kennedy was only the land manager of Rocklon. According to Ruston, the land manager's job duties included finding tenants for the MLK Property and executing lease agreements with those tenants. The only lease agreement in the record was between Rocklon and Rockal. Ruston, not Kennedy, purportedly executed the lease agreement with Rockal. Ruston testified that it was always his responsibility to arrange the filing of Rocklon's income taxes. He testified that he also gave Kennedy authority to sign the returns as well, though he was unsure how many times he signed the returns as opposed to Kennedy. Included in the appellate record is Rocklon's copy of its U.S. Corporation Income Tax Return forms for only two years—2007 and 2013. For both years, Ruston identified himself in the form as the sole "stockholder" of Rocklon.

Finally, the record before the trial court includes various reports from emergency personnel and other officers regarding their investigation of Kennedy's motor vehicle accident. Within those records is a report from a Beaumont police officer noting that Kennedy told him he was the owner of Dream Street. An accident report from a DPS officer also stated that Kennedy told him he was the owner of Dream Street. Officers took statements from some employees at Dream Street who later completed affidavits. The employees seemed uncertain of Kennedy's role in the businesses. One employee stated in his affidavit that he had

worked at Dream Street since July 2000. He stated that he believed that Kennedy had owned Dream Street, but sold it seven or eight years earlier and was currently paid only as a consultant. The employee stated that he was uncertain who actually owned the club, but had heard it was either Sherlock or Ruston. He stated, "I'm 90% sure I think the business is in [Sherlock's] name[.]" However, he stated that he considered Kennedy his boss. The employee explained that every night he worked, he would "text [Kennedy] with the numbers, what the door is, what the register is, and what the jello shots was and what the girls pay – the house fee[.]" The employee also stated that Kennedy came to the club almost every night. Another employee also completed an affidavit and stated that she believed Kennedy was her boss because she had to meet with him before she was hired. Another investigation report notes that a TABC officer informed a Beaumont police officer that he understood Kennedy had sold the club in 2006 to Sherlock, one of the club's bartenders.

As discussed above, the record before the trial court contained documentary evidence regarding the ownership, formation, and funding of Rocklon, and other evidence tending to show that Kennedy had an ownership interest in Rocklon and had full control over every aspect of the business. There is also evidence to support that Kennedy not only controlled Rocklon, but also controlled Rockal. For

24

example, after Kennedy was charged with intoxication manslaughter, Ruston did not try to locate a new land manager for Rocklon; rather, he tried to locate a new tenant for the MLK Property. The record does not indicate that Rockal was unable or unwilling to continue with the lease agreement it had maintained with Rocklon for several years. If Kennedy, Rockal, and Rocklon were separate entities as Rocklon contends, Kennedy's incapacity should not have affected Rockal's lease agreement with Rocklon. Ruston's decision to sell the MLK property suggests Kennedy was much more vital, even central, with regard to the business of both Rocklon and Rockal. Moreover, the trial court also heard evidence that Kennedy represented to others that he was the owner of Dream Street, a/k/a Rockal.

The trial court had the discretion to believe or disbelieve any of the testimony offered and weigh the witnesses' credibility. *See State Bd. of Ins. v. Prof'l & Bus. Men's Ins. Co.*, 359 S.W.2d 312, 321-22 (Tex. Civ. App.—Austin 1962, writ ref'd n.r.e.) (explaining that at a temporary injunction hearing, the trial court is the judge of the credibility of testimony and weight to be given thereto). Here, the trial court could have determined Ruston was not credible and disbelieved Ruston's testimony regarding his interest in Rocklon and the role in which Kennedy was involved. *See id.* Further, the trial court could have found the corporate documents reflecting Ruston's purported ownership interest unreliable

25

and to be the result of Kennedy's subterfuge. We conclude there is some evidence in the record tending to support that Kennedy, not Ruston, was the sole member and owner of Rocklon. *See Fox*, 121 S.W.3d at 857. While there may be other alternative conclusions that could be drawn from the evidence, we are to make all legitimate inferences that favor the trial court's order. *See Cameron*, 445 S.W.3d at 845. We further conclude that the record contains some evidence tending to show that Kennedy had full, seemingly unchecked control over every aspect of Rocklon's business until shortly after his release from jail on bond following the motor vehicle accident. *See id.*

### b.    Evidence of the Commingling of Funds

There is evidence in the record that Kennedy commingled funds between his own personal finances and those of Rocklon and Rockal. The trial court heard testimony and saw documentary evidence that Kennedy transferred assets from Rocklon to Rockal at various times and used Rocklon's assets to pay property taxes for Rockal. The record also includes the lease agreement between Rocklon, as the landlord, and Rockal, as the tenant. The lease is dated August 2, 2006, and signed by Ruston, as the president of Rocklon.[5] The lease required Rockal to pay Rocklon $3,700 a month to lease a portion of the MLK property. Under the terms

_____

[5] On February 7, 2006, Kennedy represented to the bank that he was the president of Rocklon.

26

of the lease, Rockal was required to pay all real estate taxes and assessments against the premises during the time of the lease as well as any personal taxes levied against the premises attributable to Rockal's use of the premises, including sales or use taxes in connection with lease payments. Despite the terms of the lease, there is undisputed testimony that Kennedy used Rocklon's assets to pay towards Rockal's tax obligations in 2013. There is also evidence in the record that Rocklon did not hold Rockal to the terms of its lease. Under the lease agreement, Rockal was obligated to pay Rocklon $133,200 a year to lease the premises. However, the evidence shows that for at least two years, 2007 and 2013, Rocklon reported to the IRS that it only received $53,400 and $64,840, respectively, in gross rents. Therefore, for at least two years, Kennedy allowed Rockal to continue to occupy the premises even though Rockal paid less than half the agreed upon rent.

The trial court also received evidence that Kennedy withdrew substantial amounts of money from Rocklon's account for his personal benefit, including a $10,000 check on December 30, 2012 with a memo that it served as a Christmas bonus, a $22,000 withdrawal on December 1, 2014 with no memo, and a personal withdrawal of $2,500 from a split deposit with no memo regarding its purpose or anticipated use. There is also evidence in the record that Kennedy would purchase

food products for Rockal, but there is no explanation as to how he paid for the products or whether he was reimbursed.

Given all the evidence, the trial court could have found that Kennedy was at the heart of both of these entities and that he commingled funds from Rocklon, Rockal, and his personal account in disregard of the corporate fictions.

### c.    Kennedy's Representations

Finally, Kennedy made express personal representations to the bank that he was a member of Rocklon and that he personally guaranteed Rocklon's loan. Kennedy even took out a life insurance policy on himself to support his representations to the bank. The trial court could have reasonably considered this as some evidence of Kennedy's use of these corporate fictions as his alter ego.

In conclusion, Paris was not required to prove that she would ultimately prevail at trial on her alter ego theory, but she only had to show she was entitled to preservation of the status quo pending trial. *See Cameron*, 445 S.W.3d at 845. Based on all of the evidence before the trial court concerning the total dealings that Kennedy had had with Rocklon, and viewing the evidence in a light most favorable to the trial court's finding, we conclude there was some evidence that it was probable that Paris could prevail at trial to show Kennedy had an alter ego relationship with Rocklon. *See Cappuccitti*, 222 S.W.3d 481.

28

## 2. Fraudulent Transfers

Next, Rocklon contends that Paris has no probable right to recover on her claims against Rocklon because even if Rocklon is Kennedy's alter ego, there is no evidence that Kennedy or Rocklon transferred an asset as defined under TUFTA. Because the trial court determined there was some evidence that Rocklon is Kennedy's alter ego, we may consider a transfer made by Rocklon as a transfer made by Kennedy for the purposes of this analysis. TUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Tex. Bus. & Com. Code Ann. § 24.002(12). An "asset" generally "means property of a debtor[.]" *Id*. § 24.002(2). "Property" is defined in TUFTA as "anything that may be the subject of ownership." *Id*. § 24.002(10).

The evidence shows that Kennedy collided with Kristin on January 26, 2015. Thereafter, Kennedy was arrested and detained until January 28, 2015, when he was released on bond. Upon his release, Ruston accompanied Kennedy to a branch of Rocklon's bank, where Kennedy transferred control of Rocklon's bank account to Ruston, his son. In accepting control of the account, Ruston executed a new signature card and signed the card as the "owner" of Rocklon. Despite his claim to

29

ownership of Rocklon, the evidence reflects that Ruston had never before had authority or control over Rocklon's bank account. Prior to making this change, Rocklon held a corporate meeting at the bank. The minutes of the meeting are in the record and indicate that Kennedy was present and designated himself as an "authorized sign" [sic] and Ruston was present and designated himself as the "owner" of Rocklon. The minutes provide that it was decided that Ruston would replace Kennedy as the only authorized signer on Rocklon's bank account. The minutes further provide that it was agreed that Ruston would be "authorized to transact on all accounts for the business and enter into any agreements with the bank for services provided." Immediately after Kennedy and Ruston made the changes identified above, Ruston executed another certified corporate resolution on a bank form. Ruston appears to have certified to the bank that he alone was authorized by Rocklon to engage with the bank on loans and related services. This resolution provided Ruston with the authority to communicate with the bank regarding the payoff amount for the loan on the MLK property and payoff the promissory note to the bank, which ultimately allowed him to sell the MLK property. This resolution also gave Ruston the authority to transfer any proceeds from Rocklon's bank account. The actions taken by Kennedy two days after the motor vehicle accident transferred full control of Rocklon's bank account to

Ruston. In treating Rocklon and Kennedy as the same person, the trial court could have reasoned that the Rocklon account was actually Kennedy's property. *See* Tex. Bus. & Com. Code Ann. § 24.002(2) (defining "asset"); *id.* § 24.002(10) (defining "property"). Thus, the court could have determined that when Kennedy transferred the account to Ruston and essentially disclaimed all ownership in Rocklon and its assets, Kennedy made a transfer as defined in TUFTA. *See id.* § 24.002(12) (defining "transfer"), § 24.002(2) (defining "asset").

We must next determine if there is some evidence in the record of a fraudulent transfer of assets sufficient to support a cause of action under TUFTA. Section 24.005 provides two circumstances in which a debtor's transfer of an asset is fraudulent, whether the creditor's claim arose before or within a reasonable time after the transfer was made. *Id.* § 24.005(a). First, if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor[,]" then the transfer is fraudulent. *Id.* § 24.005(a)(1). Second, a transfer is fraudulent when the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer[.]" *Id.* § 24.005(a)(2).

Because direct proof of the debtor's intent is often unavailable, in determining whether a debtor had the actual intent to hinder, delay, or defraud a creditor, a court may consider circumstantial evidence, including the non-exclusive

31

list of factors identified in TUFTA and commonly referred to as the "badges of fraud." *Id.* § 24.005(b) (listing factors); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 205 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Hahn v. Love*, 321 S.W.3d 517, 525 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The "badges of fraud" identified in the statute include consideration of whether:

> (1)     the transfer or obligation was to an insider;
> (2)     the debtor retained possession or control of the property transferred after the transfer;
> (3)     the transfer or obligation was concealed;
> (4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5)     the transfer was of substantially all the debtor's assets;
> (6)     the debtor absconded;
> (7)     the debtor removed or concealed assets;
> (8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code Ann. § 24.005(b). An individual "badge of fraud" is not conclusive, but a concurrence of many badges in the same case will make a strong case of fraud. *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007,

32

no pet.). Whether the transfer was made with actual intent to defraud creditors is ordinarily a fact question. *Id.*

Here, the trial court found Paris had a probable right to relief for violations of TUFTA against the defendants for their actions in transferring the ownership, management, and control of Rocklon with the intent to fraudulently transfer Rocklon's assets. Further, the trial court found credible evidence to support that the defendants made substantial dispositions of Rocklon's assets in violation of TUFTA. Rocklon argues that Paris failed to present evidence of any "badge of fraud" and that Paris's failure to do so prevents her from showing actual intent. However, our review of the record shows evidence of several "badges of fraud."

First, immediately after being bailed out of jail after the accident, Kennedy purported to transfer control of Rocklon's bank account to Ruston. There is some evidence in the record to support that Kennedy's post-accident actions were an attempt to disconnect himself from his alleged alter ego, Rocklon, and its assets. *See* Tex. Bus. & Com. Code Ann. § 24.002(12) (defining "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset"); Spencer W. Creed & Bobbie G. Bayless, *Fraudulent Transfers in Texas*, 39 Hous. Law. 28, 29 (Sept./Oct. 2001) (explaining that transfer under the act includes "virtually every

conceivable method by which a debtor may part with an asset or an interest in an asset"). The trial court could have determined that when Kennedy transferred control of the account to Ruston, while simultaneously disclaiming all ownership interest in Rocklon, Kennedy's actions amounted to an indirect transfer of his personal assets (i.e. the Rocklon account) to Ruston, an insider. After the transfer, Kennedy's only remaining asset appears to be his home, a small house outside of Beaumont. Therefore, when Kennedy transferred control of the Rocklon account to Ruston, he essentially transferred control of substantially all of his assets. Once Kennedy transferred control of the Rocklon account to Ruston, Ruston then proceeded to liquidate Rocklon's main asset, the MLK Property.

The evidence in the record supports that the MLK Property was more than just another asset to Rocklon. According to bank records, Kennedy formed Rocklon for the purpose of purchasing the MLK Property to then turn around and lease to the owner of Dream Street. When Ruston proceeded to sell the MLK Property, he liquidated Rocklon's only real asset, and not in the ordinary course of business for Rocklon.

Ruston did not wait long to begin the process of disposing of Rocklon's assets. On January 29, 2015, Ruston requested the payoff information from the bank for the real estate loan on the MLK Property. Ruston entered into a contract

to sell the MLK Property for $1,200,000 on March 6, 2015. When the sale was final, the proceeds of the sale were placed in Rocklon's bank account, but Ruston withdrew the proceeds from Rocklon's account and transferred them into an account at Morgan Stanley. While there is little evidence in the record as to whose name the Morgan Stanley account is in, Ruston testified at the temporary injunction hearing that it was another of "my" accounts. Since the trial court concluded that Rocklon is Kennedy's alter ego, the court could have determined that Ruston liquidated Kennedy's only real asset and then began expending the proceeds from the sale of the property.

Third, the record includes some evidence that Kennedy attempted to conceal his transfer of Rocklon's bank account to Ruston. The signature card from the bank reflects that Kennedy and Ruston went to a branch of the bank located in Kountze, Texas. Kennedy was arrested and detained in Beaumont at the Jefferson County Correctional Facility in Beaumont. At the time of the incident, Kennedy resided in Beaumont, and Ruston appears to have resided in Nederland. Rocklon's principal place of business was also located in Beaumont. There is nothing in the record to explain why Kennedy and Ruston went to an out-of-town branch of the bank, located in another county, to transfer control of the account. While Ruston testified that they did not attempt to conceal this transfer, the trial court could have

35

reasonably inferred that going to an out-of-town branch was an attempt to conceal what they were doing. Based on this evidence, the trial court could have reasonably concluded Kennedy and Ruston made an effort to conceal their actions.

Fourth, there is no evidence in the record that Ruston exchanged reasonably equivalent value for the assets he received from Kennedy. In fact, there is no evidence that Ruston gave any consideration for the benefit he received when Kennedy transferred the Rocklon account to him.

Fifth, the transfer was made after Kennedy knew he had been charged with intoxication manslaughter. The trial court could have determined that due to Kennedy having been involved in a prior dram-shop lawsuit, Kennedy made this transfer knowing that a civil lawsuit was likely imminent, and he may be subjected to a substantial judgment arising out of Kristen's death.

The trial court found that Kennedy, through his alter ego Rocklon, made a transfer to an insider, concealed the transfer, and made the transfer shortly before and shortly after a substantial debt was incurred. While alternative inferences could be drawn from the evidence, we must indulge reasonable inferences that support the trial court's findings. *See Cameron*, 445 S.W.3d at 845. Therefore, we conclude the evidence in this case, when viewed in the light most favorable to the trial court's findings, supports the trial court's findings concerning the badges of

36

fraud. Because the defendants' actions bore several indicia of fraud, we conclude the trial court did not abuse its discretion in determining that Paris had a probable right to relief on her fraudulent transfer claims. *See Walker*, 232 S.W.3d at 914.[6]

## B. Imminent and Irreparable Harm

To be entitled to a temporary injunction, Paris must also show that absent the injunction, she would suffer an irreparable injury. *See Butnaru*, 84 S.W.3d at 204. If an injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard, then we will consider the injury irreparable. *Id.* To prove an inadequate remedy at law, an applicant is required to show that its damages are incapable of calculation or that the defendant is incapable of responding in damages. *See Tel. Equip.*, 80 S.W.3d at 610.

Rocklon contends that Paris failed to present sufficient evidence that there is a risk of imminent and irreparable harm. Rocklon argues there is no evidence that it is insolvent, that its assets have been dissipated, or that Rocklon has intentionally

---

[6] Because we have concluded that the evidence supports a finding of probable right to relief under section 24.005(a)(1), we need not address whether the transfers were fraudulent under section 24.005(a)(2) or section 24.006. *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a), 24.006; *see also Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395 S.W.3d 325, 329 (Tex. App.—Dallas 2013, no pet.) (concluding that the appellate court may find evidence sufficient and affirm a trial court's judgment on TUFTA claims if the evidence supports a fraudulent transfer under either subsection 24.005(a)(1) or section 24.006).

depleted its assets. Paris responds that there is sufficient evidence to support that immediately after Kristin's death, defendants, in a calculated and organized effort, intentionally destroyed evidence, ceased normal business operations, adjusted bank accounts, sold Rocklon's only asset, and started expending the proceeds from the sale of its only asset. According to Paris, all of these facts considered together are sufficient evidence to support a finding that if Ruston were permitted continued access to the Morgan Stanley account unimpeded by the injunction, Rocklon may become judgment-proof, rendering any verdict obtained by Paris meaningless.

It is undisputed that during the criminal investigation of Kennedy, someone with password-protected access obtained and intentionally destroyed Dream Street surveillance video from the night of the incident. However, there is no specific evidence that either Ruston or Kennedy had anything to do with the destruction of the evidence.

It is also undisputed that soon after Kristin's death and immediately upon Kennedy's release on bond, Kennedy and Ruston went to Rocklon's bank, and Kennedy transferred all authority to manage the Rocklon account from Kennedy to Ruston. Ruston testified that because Kennedy was no longer able to manage the property, he contacted someone else to lease the property, but that "fell through." Ruston testified that after the new lease deal fell through, he received a fair offer

38

for the MLK Property and decided to sell. Thus, not long after Kristin's death, Ruston sold Rocklon's only asset. Very shortly after completing the sale of the property, Ruston began writing checks to himself and made substantial withdrawals from the account, expending or otherwise removing large sums from Rocklon's account. On January 31, 2015, Ruston withdrew $5,000 from the Rocklon account. On February 19, 2015, Ruston wrote a check for $545 to himself from the Rocklon account. On April 2, 2015, Ruston wrote a check to cash for $2,500 from the Rocklon account. On April 2, 2015, Ruston wrote a second check to cash for $2,500 from the Rocklon account. On September 2, 2015, Ruston withdrew $18,000 from Rocklon's account with a memo indicating it was payable to "Farah Meredith." The purpose of these withdrawals is unclear from the record. At the temporary injunction hearing, Ruston testified that from the proceeds of the MLK Property, as the owner of Rocklon, he anonymously donated funds to the Kristin Paris Foundation, paid legal fees, paid taxes, purchased a tractor to do land work, and transferred the remaining funds into an account held by Morgan Stanley. Ruston testified that he intended to use the remaining proceeds to invest in another piece of property.

Regarding the proceeds that remained after these withdrawals, Ruston testified that he transferred them into a new account because he believed doing so

was necessary to secure the proceeds and make sure they "wouldn't go anywhere." However, it is undisputed that Ruston was the only one authorized to sign checks or make withdrawals from the Rocklon account. It is not known from the evidence in the record whether Ruston transferred the proceeds from the sale into an account bearing his name personally or an account in Rocklon's name.

At the time of the hearing, it was also undisputed that Rocklon had no other income-producing assets. There is no evidence to show Rocklon's debts at the time of the hearing. There is evidence that at the time Rocklon applied for a loan to purchase the MLK Property, it had substantial outstanding liabilities—including the loan for the MLK Property. The form concludes that it had liabilities of $300 thousand dollars.

The evidence presented during the temporary injunction demonstrates that the circumstances surrounding the transfer of control of the bank account, the sale of the MLK Property, and the rapid expenditure of some of the proceeds for personal use, raise a question regarding Ruston's intentions and the future solvency of Rocklon. There is evidence in the record to support that Rocklon's sole purpose was to lease the MLK Property to the company or person operating Dream Street. After having sold the MLK Property, Rocklon's continued viability is uncertain. The trial court obviously rejected Ruston's version of the facts and his stated

intentions for the funds when it found Paris would not have an adequate remedy at law because the defendants would continue to expend its assets until Rocklon was insolvent. Considering the evidence in a light most favorable to the trial court's finding, we cannot conclude the trial court abused its discretion in finding Paris had no adequate remedy at law and that the injunction was necessary to maintain the status quo pending a final determination on the merits of the TUFTA claims. *See Tel. Equip.*, 80 S.W.3d at 611 (holding that the trial court did not abuse its discretion when evidence demonstrated that an injunction was necessary to prevent action that would essentially render debtor insolvent, judgment-proof, or an empty corporate shell thereby giving creditor no adequate remedy at law); *Blackthorne*, 61 S.W.3d at 444-45 (holding that the trial court did not abuse its discretion by concluding as a matter of law that the injunction was necessary to maintain the status quo pending a final determination on the merits of the fraudulent transfer claims because the debtor would become judgment-proof if allowed to transfer assets). Accordingly, we overrule Rocklon's second issue.

## IV. Pre-Suit Attachment of Assets

In its first issue, Rocklon contends that the trial court's temporary injunction is improper because a temporary injunction may not be used to freeze assets unrelated to the subject matter of the suit in order to ensure funds to pay a future

potential judgment. Rocklon argues that Paris essentially sought a "pre-suit attachment of assets to satisfy a potential judgment that they may or may not obtain in the future." Relying upon *Reyes v. Burrus*, 411 S.W.3d 921 (Tex. App.—El Paso 2013, pet. denied), Rocklon maintains that Paris is not entitled to enjoin Rocklon's assets because Rocklon's assets, including the MLK Property or the sales proceeds therefrom, are not the subject of Paris's wrongful death and survival damages claim. In support of its position that the injunction is improper, Rocklon also cites *Victory Drilling, LLC v. Kaler Energy Corp.*, No. 04-07-00094-CV, 2007 WL 1828015 (Tex. App.—San Antonio, June 27, 2007, no pet.) (mem. op.), and *Nowak v. Los Patios Inv'rs, Ltd.*, 898 S.W.2d 9 (Tex. App.—San Antonio 1995, no writ). However, Rocklon's reliance on these cases is misplaced because they do not involve claims brought under TUFTA. *See Reyes*, 411 S.W.3d at 923 (indicating that defendant sought temporary injunction in connection with counterclaim for tortious interference with a contract); *Victory Drilling*, 2007 WL 1828015 at *3 (recognizing that TUFTA may have provided a remedy, but noting that plaintiff did not invoke TUFTA in its pleadings in the trial court); *Nowak*, 898 S.W.2d at 9 (indicating plaintiff filed suit for embezzlement, fraud, conversion, money had and received, civil theft, and breach of contract).

As detailed above, at the temporary injunction hearing, Paris presented the trial court with evidence that Rocklon was the alter ego of Kennedy and that after the motor vehicle accident, Kennedy transferred control and interest of Rocklon's bank account to Ruston who then began the process of selling Rocklon's sole asset, the MLK Property. Approximately two months after Kristin's death, Ruston successfully liquidated Rocklon's only asset and had begun expending proceeds from the sale and transferring them to other locations. The trial court enjoined Rocklon from further disposition of the proceeds. The proceeds from the sale of the MLK Property are the type of assets the legislature contemplated could be subject to injunction under TUFTA. *See* Tex. Bus. & Com. Code Ann. § 24.008(a)(3)(A); *see also Tel. Equip.*, 80 S.W.3d at 610. Under TUFTA, the trial court may find substantial likelihood of success on the merits when it is "presented with evidence of intent to defraud the creditor." *See Tanguy v. Laux,* 259 S.W.3d 851, 858 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Tel. Equip. Network, Inc.,* 80 S.W.3d at 609. Therefore, we conclude the temporary injunction was not an improper pre-suit attachment of property. We overrule Rocklon's first issue and affirm the order of the trial court granting temporary injunction.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on June 15, 2016
Opinion Delivered October 20, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.

44