**Jeff FOX, Individually and d/b/a Freshwater Fish, Inc., Appellant,**

v.

**TROPICAL WAREHOUSES, INC., Appellee.**

No. 2–03–113–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 20, 2003.

Rehearing Overruled Jan. 8, 2004.

Hayes, Coffey & Berry, P.C. and Michael R. Lipscomb, Denton, for Appellant.

Grace A. Weatherly, R. William Wood, Denton, for Appellee.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### Introduction

This is an interlocutory appeal from the trial court's grant of a temporary injunction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2004). Appellant Jeff Fox, individually and doing business as Freshwater Fish, Inc., appeals from the trial court's order enjoining him and his agents, servants, employees, attorneys, and all those acting on his behalf ("representatives") from (1) altering, destroying, or using information contained in a rolodex and computer that he removed from appellee Tropical Warehouses, Inc.'s premises and (2) selling tropical freshwater fish within Texas to Wal–Mart or Petco. In four issues, Fox contends that the trial court abused its discretion in granting the temporary injunction because (i) the items Tropical Warehouses, Inc. (TWI) seeks to enjoin Fox from using are not trade secrets, (ii) there is no evidence Fox used any trade secrets of TWI to gain a competitive advantage over TWI, (iii) there is no evidence TWI has suffered any irreparable harm, and (iv) TWI has not shown the absence of an adequate remedy at law. We modify the temporary injunction and affirm it as modified.

### Factual and Procedural Background

TWI is a freshwater tropical fish wholesaler. Its owner, Danny Martinez, has been in the freshwater tropical fish business for approximately thirty years. TWI has been selling fish to Wal–Mart stores since 1978 and to Petco for the last 6 or 7 years. As of January 2003, Wal–Mart and Petco comprised over 99.9 percent of TWI's business.

In 1991, TWI hired Fox as its general manager. As general manager, Fox had access to TWI's financial information, including pricing and sales figures, contact information, and details of its operation. Fox was TWI's sole contact with the Petco buyers and had authority to give discounts and special offers to Petco without prior approval. Two-thirds of Fox's income was derived from TWI's sales to Petco.

In December 2002, Fox told Martinez that Petco was demanding a ten percent discount on fish as a mortality allowance. At Martinez's direction, Fox negotiated a five percent discount with Petco. In mid-January 2003, Martinez began an analysis of the Petco account to determine the difference in the prices he was charging to Petco and Wal–Mart. Fox supplied Martinez with at least some of the pricing information used in the analysis. Martinez and his son supplied pricing information for the analysis as well.

In February 2003, a day before Martinez completed the analysis, Fox told Martinez that Petco had demanded an additional fifteen percent price reduction. Based on that information and his completed analysis, which showed that the prices TWI was charging Petco were 19 to 23 percent less than the prices it was charging Wal–Mart, Martinez decided he could not sell fish to Petco with the additional discount. At Martinez's direction, Fox sent Petco an email stating that "Danny/TWI has decided not to match the current offer on the table." He did not show Martinez the email before he sent it. Martinez contends that he told Fox he wanted to review any communication with Petco before Fox sent it and that his intention was to try to negotiate a more favorable price with Petco rather than simply discontinuing business with them.

In mid-February, Fox gave his notice of resignation; his last day of work was Feb-

ruary 27, 2003. He took a rolodex and computer from the office with him. Fox had purchased the computer, but he kept it at TWI and used it in connection with his work there. The rolodex and computer contained contact information for TWI's customers; the computer also contained purchasing information, payroll reports, prices, sales data, vendor and supplier information, loss rates, and business history for TWI.

On February 21, 2003, Fox incorporated Freshwater Fish, Inc., which began selling fish to Petco at the discounted price Petco had demanded from TWI. Fox began organizing the business while still employed by TWI. On March 17, 2003, TWI filed suit against Fox, individually and doing business as Freshwater Fish, Inc., for misappropriation of trade secrets. In its petition, TWI requested temporary and permanent injunctive relief. On April 3, 2003, after a hearing, the trial court signed an order granting TWI a temporary injunction.

## Standard of Review

■ To be entitled to a temporary injunction, the applicant must plead a cause of action and show a probable right to recover on that cause of action and a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex.App.-Amarillo 1995, no writ). An injury is irreparable if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *see T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

■ The purpose of a temporary injunction is to preserve the status quo until a trial on the merits. *Butnaru*, 84 S.W.3d at 204; *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). "Status quo is defined as 'the last, actual, peaceable, noncontested status which preceded the pending controversy.' " *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex.App.-Austin 2000, no pet.) (quoting *Transp. Co. v. Robertson Transps., Inc.*, 152 Tex. 551, 261 S.W.2d 549, 553–54 (1953)).

■ In an appeal from an order granting or denying a temporary injunction, the scope of review is restricted to the validity of the order granting or denying relief. *Walling*, 863 S.W.2d at 58; *Thompson*, 24 S.W.3d at 576. Whether to grant or deny a request for a temporary injunction is within the trial court's discretion, and we will not reverse its decision absent an abuse of discretion. *Butnaru*, 84 S.W.3d at 204; *Walling*, 863 S.W.2d at 58. Accordingly, when reviewing such a decision, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion. *Thompson*, 24 S.W.3d at 576; *CRC–Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ). A trial court does not abuse its discretion if it bases its decision on conflicting evidence and evidence in the record reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978); *Myers*, 927 S.W.2d at 262.

## Trade Secret Protection

■ In his first two issues, Fox contends that the information TWI seeks to protect does not constitute a trade secret and that there is no evidence he used any

of the information to gain a competitive advantage over TWI. In her ruling from the bench, the trial judge found that TWI's price lists, sales reports, and certain of its business records contained on Fox's computer, including a yearly payroll sales comparison report and several reports specific to Wal–Mart's stores and fish sales, some of which were prepared by Wal–Mart, were entitled to trade secret protection until trial.

A trade secret is " 'any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.' " *In re Bass,* 113 S.W.3d 735, 739 (Tex.2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996)). The supreme court has identified six nonexclusive relevant criteria a court should consider in determining whether information is entitled to trade secret protection: (1) the extent to which the information is known outside the holder's business; (2) the extent to which it is known by employees and others involved in the holder's business; (3) the extent of the measures taken by the holder to guard the secrecy of the information; (4) the value of the information to the holder and its competitors; (5) the amount of effort or money expended by the holder in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* Information generally known and readily available is not protectable, but the fact that information is discoverable by lawful means does not deprive its owner of protection from one acquiring it by unfair means. *Gonzales v. Zamora,* 791 S.W.2d 258, 264–65 (Tex.App.-Corpus Christi 1990, no writ). Even in the absence of an enforceable nondisclosure agreement, a former employee may not use confidential information or trade secrets the employee learned in the course of his employment for his own advantage and to the detriment of his employer. *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 551 (Tex.App.-Dallas 1993, no writ).

When deciding whether to grant or deny a request for a temporary injunction, the trial court does not decide whether the information sought to be protected is a trade secret; rather it determines whether the applicant has established that the information is entitled to trade secret protection until a trial on the merits. *Ctr. for Econ. Justice v. Am. Ins. Ass'n,* 39 S.W.3d 337, 343 (Tex.App.-Austin 2001, no pet.); *see T–N–T Motorsports, Inc.,* 965 S.W.2d at 23–24. That an order is issued granting trade secret protection does not mean the protected information is a trade secret. *Ctr. for Econ. Justice,* 39 S.W.3d at 343.

Martinez testified that TWI keeps the prices it charges to Wal–Mart and Petco a closely guarded secret. He testified that Fox knows his password for accessing Wal–Mart's store sales information and that Fox could use this information to undercut the prices TWI charges to Wal–Mart. He said that the Petco invoices that were used in the warehouse did not show the wholesale prices TWI charged to Petco. While Fox agreed that the vendors who attend trade shows share information about "all aspects of the business," he admitted that they do not share information about pricing.

TWI contends that its customer information contained on Fox's computer and rolodex constitutes a compilation of information that is used in TWI's business and that the compilation of the information in usable form is entitled to trade secret protection. TWI introduced into evidence exhibit 17, which includes a list of Wal–Mart stores that TWI sells to with the store number, location, and telephone number for each store and a list of the Petcos TWI

was servicing through the first part of March 2003 with the phone and fax numbers and shipping address for each store. Martinez testified that this information cannot be obtained just by looking in the phone book and that having this information would enable a person to more easily and readily compete with TWI. Martinez also said that this information was on Fox's computer.

Martinez further testified that the TWI employee handbook that was in effect when Fox was employed with TWI requires that visitors to TWI's premises sign-in so that access to the facility is controlled. After Fox left TWI, Martinez installed a no-visitors sign outside the premises. According to Martinez, TWI requires that visitors to the premises be escorted by TWI personnel. Several employees had access to TWI's price information as shown on invoices from vendors and invoices to Petco and Wal–Mart. Martinez has never had any of these people sign noncompetition or nondisclosure agreements. But TWI's computers, except for Fox's, are networked, and the warehouse employees do not have access to them. Martinez said that the financial information is kept private by keeping the computers in locked offices after business hours.

Martinez testified that TWI's confidential information is valuable to TWI because it is something he has acquired and achieved over a thirty-year period and is not "something that [he] would just give out to anybody." He stated that he did not intend for Fox to be able to use the information to compete with TWI.

Fox admitted that the only way he knew Petco was looking to buy fish at a cheaper price is because of his employment at TWI, that he would not have known about the vendors Freshwater Fish buys from other than through his employment at TWI, and that he had no contacts in the

business before working at TWI. He also admitted that of the approximately 500 freshwater tropical fish suppliers in the Tampa, Florida area, Freshwater Fish buys from the same 5 or 6 that TWI buys from and that Freshwater Fish buys from the same Miami fish importers and the same goldfish suppliers as TWI and that he knew about those vendors solely because of his employment with TWI. Freshwater Fish employs four other former TWI employees.

The evidence shows that Fox has access to and possession of TWI's pricing information, customer lists, sales and payroll data, and other information regarding TWI's relationship with Wal–Mart and Petco. The evidence further shows that TWI did not intend to share this information outside of the business, that it took steps to limit the number of employees with access to the information, and that this type of information is not generally shared within the industry. This information is important to TWI's business because (1) a competitor with knowledge of TWI's prices could use that information to undercut the prices TWI charges to Wal–Mart, its largest, and for all practical purposes sole, current customer, and (2) TWI cannot update its sales and payroll reports without access to the prior versions on Fox's computer. Thus, applying the relevant criteria and the appropriate standard of review, we hold that the trial court did not abuse its discretion in determining that TWI's price lists, customer lists, and the information contained in the reports introduced into evidence as exhibit 20 are entitled to trade secret protection until trial. *See T–N–T Motorsports, Inc.,* 965 S.W.2d at 22 (noting that customer lists, pricing information, client information, customer preferences, buyer contacts, and market strategies have been shown to be trade secrets); *Miller Paper Co.,* 901 S.W.2d at 601 (same).

Fox contends that even if this information is entitled to trade secret protection, TWI has not proven that he is using the information to gain a competitive advantage over TWI. However, TWI is not required to prove that Fox is actually using the information; it need only prove that he is in possession of the information and is in a position to use it. *See Rugen*, 864 S.W.2d at 552; *see also T–N–T Motorsports, Inc.*, 965 S.W.2d at 24 (holding that appellant possessed confidential information of former employer and was in a position to use it; thus, appellant was likely to use information to former employer's detriment). Not only was Fox privy to this information while employed with TWI, the evidence shows that he has access to the information via the computer and rolodex he removed from TWI's premises. Accordingly, we overrule Fox's first two issues.

### Probable, Imminent, and Irreparable Injury

Fox contends that TWI has not shown that it will be irreparably harmed by his actions and that even if it has, it has not shown that it has no adequate remedy at law. Fox claims that because TWI declined to sell to Petco at the discounted prices and because Martinez admitted he would never sell to Petco at those prices, then TWI is not being harmed.

With respect to Wal–Mart, the evidence shows that Fox and Freshwater Fish have possession of and access to confidential information about TWI's sales to Wal–Mart, including the wholesale prices TWI charges to Wal–Mart. Martinez testified that with this information, a competitor could set its wholesale prices lower than TWI's and divert all of Wal–Mart's business away from TWI. Martinez also testified that he could not come up with a number that would be suitable compensation as damages if this were to occur.

Indeed, the evidence shows that Wal–Mart and Petco comprised over 99.9 percent of TWI's business; thus, Wal–Mart comprises almost all of TWI's current business. It is a reasonable inference from the evidence that the loss of Wal–Mart as a customer would end TWI's operation and that the damages from such an occurrence would be difficult to calculate. Therefore, we hold that the trial court did not abuse its discretion in finding that TWI would suffer a probable injury if Fox and Freshwater Fish were not enjoined from selling tropical freshwater fish to Wal–Marts in Texas until trial.

Fox contends that even if the trial court did not abuse its discretion in finding that TWI would suffer a probable injury as to Wal–Mart, it did abuse its discretion in finding that TWI would suffer a probable injury as to Petco. Fox asks that as an alternative to reversing the trial court's decision, we modify the temporary injunction to remove the restraint against selling tropical freshwater fish to Petco stores in Texas. *See T–N–T Motorsports, Inc.*, 965 S.W.2d at 25 (holding that appellate court may modify a temporary injunction that is overly broad).

The evidence shows that Fox also has access to and possession of confidential information regarding TWI's sales to Petco, including the wholesale prices TWI charged to Petco and the discounts Petco requested. Martinez testified that with this information, Fox and Freshwater Fish could sell fish to Petco cheaper than TWI sells fish to Wal–Mart, and Petco could set its retail prices lower than Wal–Mart's. Martinez stated that he would lose money if Petco was able to sell fish cheaper than Wal–Mart. He also testified that there are locations in which Petco and Wal–Mart are in direct competition in the same city.

In contrast to the consequences to TWI if Freshwater Fish were to use TWI's

confidential information to sell fish to Wal–Mart cheaper than TWI, the evidence shows that the consequences to TWI if Freshwater Fish continues to sell to Petco are much more speculative. Martinez testified that he would lose money if Petco were able to sell fish to the public cheaper than Wal–Mart. However, there is no evidence in the record about what cities Wal–Mart and Petco compete in, whether TWI and Freshwater Fish sold to both stores in those markets, or the current retail prices both stores charged in those markets. In addition, the evidence shows that while Fox was employed with TWI, TWI sold fish to Petco at a lower price than it sold fish to Wal–Mart. There is no evidence as to whether TWI's sales to Wal–Mart were harmed as a result.

Furthermore, Martinez testified that he still would not give Petco the discount it asked for and that he would not give it "any better deal" than he had previously. The record shows that Petco based its prices on the prices charged by Segrest Farms, another supplier, and that Petco would not do business with any company that did not match Segrest Farms' prices. There is no evidence that TWI would be harmed by Freshwater Fish selling fish to Petco at the discounted prices that TWI chose not to accept and would not currently accept and that another supplier would accept.

An injunction is not proper when the claimed injury is merely speculative; fear and apprehension of injury are not sufficient to support a temporary injunction. *Jordan v. Landry's Seafood Rest., Inc.,* 89 S.W.3d 737, 742 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g). Because TWI's evidence of injury with respect to Freshwater Fish's sales to Petco is merely speculative, we hold that the trial court abused its discretion in finding that TWI would suffer a probable, imminent, irreparable injury if Fox and Freshwater Fish were not temporarily enjoined from selling tropical freshwater fish to Petco in Texas. We sustain Fox's third and fourth issues as to Petco, but not as to the remainder of the temporary injunction.

**Conclusion**

Because there is no evidence that TWI will suffer a probable, imminent, and irreparable injury if Fox, Freshwater Fish, and their representatives are not temporarily enjoined from selling tropical freshwater fish to Petco in the State of Texas, we modify paragraphs number one and two of the temporary injunction to enjoin Fox, Freshwater Fish, and their representatives from:

1. Altering, destroying, or using information contained in the rolodex or computer equipment removed from Tropical Warehouses, Inc.'s premises, except that Jeff Fox, individually and doing business as Freshwater Fish, Inc., his agents, servants, employees, attorneys, and all those acting on his behalf, whether alone or in any combination with him or others, directly or indirectly, may use the information to the extent that Freshwater Fish, Inc.'s sales to Petco were based on that information; and

2. Selling freshwater tropical fish within the State of Texas to Wal–Mart.

We affirm the temporary injunction as modified.