# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00498-CV

---

**Greg Abbott, in his Official Capacity as the Governor of Texas; and Ruth Hughs, in her Official Capacity as Texas Secretary of State, Appellants**

**v.**

**The Anti-Defamation League Austin, Southwest, and Texoma Regions; Common Cause Texas; and Robert Knetsch, Appellees**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-005550, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

**PER CURIAM**

In this accelerated appeal, Greg Abbott, in his official capacity as the Governor of Texas, and Ruth Hughs, in her official capacity as the Texas Secretary of State, (collectively the State Officials) appeal the trial court's interlocutory order that denied their respective pleas to the jurisdiction and granted temporary injunctive relief. For the following reasons, we affirm the trial court's order.[1]

---

[1] On October 19, the notice of appeal was filed, and appellees filed an unopposed motion for expedited consideration. In response, we requested an expedited schedule for briefing, and the appeal has proceeded in an expedited manner. *See* Tex. R. App. P. 2 (authorizing appellate court to suspend rule's operation to expedite decision or for other good cause).

## BACKGROUND

"The secretary of state is the chief election officer of the state." Tex. Elec. Code § 31.001; *see, e.g.*, *id.* § 31.004(a) ("The secretary of state shall assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code."). Local election officials, however, are designated as the officials "in charge of and responsible for the management and conduct of the election" in the election precinct that they serve. *Id.* § 32.071 ("The presiding judge is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves."); *see id.* § 32.031(a) (requiring presiding judge for each election precinct to appoint election clerks to assist in conducting election). And the early voting clerks, who are the county clerks for general elections, are the officials who are responsible for managing and conducting early voting. *Id.* §§ 83.001(c) (stating that early voting clerk generally "has the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting"), .002(1) (stating that county clerk is early voting clerk for county in general election).

To vote early by mail, a registered voter must meet specific eligibility requirements, *see id.* §§ 82.001–.004 (providing eligibility requirements), and comply with other provisions, such as applying for the ballot, *see id.* § 84.001, and returning the marked ballot to the early voting clerk in the official carrier envelope, *see id.* § 86.006(a). Among the voter's options for returning the ballot to the early voting clerk is delivering it "in person to the early voting clerk's office [but] only while the polls are open on election day." *Id.* § 86.006(a-1). The parties agree that when the early voting clerk is the county clerk, the "early voting clerk's office"

2

includes the clerk's main and satellite offices. *See* Tex. Gov't Code § 311.012(b) (stating that singular includes plural).

On March 13, 2020, the Governor issued a proclamation certifying that "COVID-19 poses an imminent threat of disaster" in this state and declaring "a state of disaster for all counties in Texas." *See id.* § 418.014(a) ("The governor by executive order or proclamation may declare a state of disaster if the governor finds a disaster has occurred."). He has renewed the disaster declaration monthly, *see id.* § 418.014(c) (requiring governor to renew state of disaster every thirty days), and issued subsequent proclamations addressing the disaster. On July 27, the Governor issued a proclamation because of the COVID-19 pandemic to "ensure that elections proceed efficiently and safely when Texans go to the polls." Relevant here, the Governor "suspend[ed] Section 86.006(a-1) of the Texas Election Code, for any election ordered or authorized to occur on November 3, 2020, to the extent necessary to allow a voter to deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day." As support for the partial suspension of this statutory provision, the Governor cited his powers under the Texas Disaster Act of 1975, expressly citing sections 418.014 and 418.016, *see id.* §§ 418.014, .016(a) ("The governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster."); *see also id.* § 418.011 (stating that governor is responsible for meeting dangers to state and people presented by disaster). The Governor also found, in "consultation" with the Secretary, that for the November 3 election, "strict compliance with the statutory requirements" in section 86.006(a-1) "would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster."

3

The Governor's July 27 Proclamation was challenged by a petition for writ of mandamus filed directly with the Texas Supreme Court on September 23. *See generally In re Hotze*, __ S.W.3d __, No. 20-0739, 2020 Tex. LEXIS 927 (Tex. Oct. 7, 2020) (orig. proceeding). The Texas Supreme Court denied the petition, explaining that the relators' delay in bringing the challenge precluded consideration of their claims. *Id.* at *4. The Court observed that "the election [was] already underway," that the "Harris County Clerk has represented to the Court that his office would accept mailed-in ballots beginning September 24," and that "[t]o disrupt the long-planned election procedures as relators would have us do would threaten voter confusion." *Id.* Neither party in this case has challenged the July 27 Proclamation. Thus, for purposes of this appeal, it has "the force and effect of law." *See* Tex. Gov't Code § 418.012 (authorizing governor to issue proclamations that have "the force and effect of law").

After several Texas counties, including Harris and Travis, announced their intentions to have multiple ballot return locations in their counties, and shortly before the Texas Supreme Court's disposition of the *In re Hotze* original proceeding declining to overturn the July 27 Proclamation, *see* 2020 Tex. LEXIS 927, at *4, the Governor issued a proclamation on October 1 that amended the July 27 Proclamation to require the early voting clerk to designate a single location for returning a mail ballot beginning on October 2, as follows:

> I further suspend Section 86.006(a-1) of the Texas Election Code, for any election ordered or authorized to occur on November 3, 2020, to the extent necessary to allow a voter to deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day; provided, however, that beginning on October 2, 2020, this suspension applies only when:

4

> (1) the voter delivers the marked mail ballot at a single early voting clerk's office location that is publicly designated by the early voting clerk for the return of marked mail ballots under Section 86.006(a-1) and this suspension . . . .[2]

Included in this amendment, the Governor declared that "an amendment to the suspension of the limitation on the in-person delivery of marked mail ballots, as made in the July 27 proclamation, is appropriate to add ballot security protocols for when a voter returns a marked mail ballot to the early voting clerk's office" and also cited provisions of the Texas Disaster Act, including sections 418.011, 418.012, 418.016 and 418.018(c). *See* Tex. Gov't Code §§ 418.011, .012, .016(a), .018(c) ("The governor may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area."); *see also id.* § 418.012 (authorizing governor to amend proclamations issued under chapter).

On October 5, the Anti-Defamation League Austin, Southwest, and Texoma Regions; Common Cause Texas; and Robert Knetsch sued the Governor, seeking declaratory and injunctive relief from the October 1 Proclamation.[3] They sought declarations that "Texas law, including Texas Election Code § 86.006(a-1), does not limit the number or locations of early voting drop-off sites that the statutory Early Voting Clerks may provide to the voters of their respective counties" and that the October 1 Proclamation was "an unconstitutional infringement of equal protection and voting rights as protected by Article 1, Section 3 of the Texas Constitution." They further sought temporary and permanent injunctive relief to enjoin "the

---

[2] The October 1 Proclamation also requires the early voting clerk to allow "poll watchers the opportunity to observe any activity conducted at the early voting clerk's office location related to the in-person delivery of a marked mail ballot," but this requirement has not been challenged.

[3] The amendment in the October 1 Proclamation at issue here also has been challenged in the federal courts. *See generally Texas League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2020 U.S. App. LEXIS 32211 (5th Cir. Oct. 12, 2020).

enforcement of [the Governor]'s proclamation forcing the statutory Early Voting Clerks to operate only one drop-off location for vote-by-mail ballots." Appellees attached exhibits to their petition, including the Attorney General's September 30 letter with attachments that was filed with the Texas Supreme Court in *In re Hotze*. In that letter, the Attorney General represented to the Texas Supreme Court that "office," as used in section 86.006(a-1) of the Election Code, includes its plural, "offices," and that "the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office." One of the attachments to the letter was an August 26 email sent from the Secretary of State's office that confirmed: "Because the hand-delivery process can occur at the early voting clerk's office, this may include satellite offices of the early voting clerk."

The Governor answered and filed a plea to the jurisdiction, and appellees filed an amended petition that added the Secretary as a defendant. On October 13, the trial court held a remote hearing on appellees' request for temporary injunctive relief and the State Officials' pleas to the jurisdiction. The Secretary waived service during the hearing and subsequently filed her plea to the jurisdiction. Appellees' witnesses during the hearing were the Executive Director of Common Cause Texas; one of Common Cause Texas's members; a Vice President of the Anti-Defamation League's Central Division; Knetsch, a registered voter in Harris County over the age of 65; Thomas Randall Smith, a registered voter in Harris County over the age of 65 with compromised health; and experts Edgardo Cortés, Dr. Krutika Kuppalli, Stephen Vladeck, and Dr. Daniel Chatman. The exhibits included the experts' respective reports. The State Officials' sole witness was Keith Ingram, the Director of the Elections Division for the Secretary.

Cortés testified about ballot security, describing the security measures in place at the early voting clerks' offices, the necessity of providing additional methods for voters to return

6

mail ballots in person in light of the COVID-19 pandemic, and the reasons behind his opinion that the security measures in place in Travis and Harris Counties were adequate to protect the integrity of the electoral process at their return locations for mail ballots. He explained that the mail ballots are logged and placed in secured and sealed ballot containers by a bipartisan team. He further testified that limiting the return of the mail ballots to one drop-off location would be a "barrier" to voting and explained his reasoning for his opinion.[4]

Kuppalli, an assistant professor in the field of infectious disease, testified that COVID-19 is a concern in Texas and that increased concentrations of people that leads them to be closer together facilitates the transmission of COVID-19 and will exacerbate the COVID-19 crisis. She testified: "We know that decreasing the number of individuals that have to stand in line and the density of individuals congregating in general reduces the risk of COVID-19 transmission." In her report, she further stated: "Changing the rules for voting one month prior to election day serves to not only disenfranchise voters but will cause individuals to unnecessarily place themselves at risk for COVID-19." Vladeck, a law professor, testified as an expert on the Texas Disaster Act and its relation to the Model Emergency Health Powers Act

---

[4] He testified to the reasons behind his opinion as follows:

> The—the geographical size of the counties in Texas is pretty substantial. And so, for a voter to reach one of—if there's only a single location, it may be quite extraordinary effort on the part of the voter to figure out a means to get transportation to the site to drop off. In addition to that, if you are funneling voters into one just location for in-person drop-off, because of the way the processes and procedures work, especially with the logging and provision of photo I.D., you could have a situation where you then are creating a line at the singular drop-off location; and so people will have to wait in line in close proximity to others, which, in many cases in this pandemic situation, is a main driver for people that are eligible to vote absentee, so as not to have that level of exposure.

The State Officials did not offer contradicting evidence.

7

(MEHPA). He was not aware of another example where ballot security was offered as the specific reason for a measure tied to a state disaster act that is "largely derived" from the MEHPA. In his opinion, section 418.016 requires a relationship between the underlying emergency and the suspension and the challenged portion of the October 1 Proclamation "lack[ed] such a connection to the underlying disaster."

Chatman provided analysis concerning the increased travel burden and length of lines at the ballot return locations that are permitted under the October 1 Proclamation. It was his opinion that the reduction of return locations had a disparate impact on minority communities.[5] Smith also testified about his specific travel and health problems and that the October 1 Proclamation had made it harder for him to vote. His travel time increased from five minutes to drop off his ballot to having to drive for forty-five minutes, and he testified that he "can't drive for 45 minutes."

---

[5] For example, based on his study, Chatman determined that there was a 90-minute travel burden for some absentee eligible voters and that this burden on a statewide basis had a disparate impact among African Americans and Hispanics. He testified:

> I looked at the major race ethnicity groups in the state to determine whether or not there was a disparate impact among African Americans and Hispanics. And what I found was that, indeed, African Americans, due to the fact that they were less likely to have auto access in the household, were also twice as likely as whites, who are also eligible for an absentee ballot, to have a roundtrip exceeding 90 minutes. So there was around 14 and a half percent for African Americans compared to around 7 percent for whites. The multiplier for Hispanics was not quite as stark, but it was 24 percent higher than whites.

He further testified that it varied by counties, providing specific examples, such as in Harris County, "African Americans are 1.5 times as likely to have a travel burden exceeding 90 minutes; whereas, Hispanics are 90 percent as likely, so probably within statistical bounds of being roughly the same as whites." The State Officials did not offer contradicting evidence.

8

On behalf of the State Officials, Ingram testified that the October 1 Proclamation did not affect election day; that "[i]n the July 14th primary runoff, Harris County used its annex offices as hand-delivery locations on election day"; that this use was "within the language of the statute"; and that, on the general election day, "early voting clerk's office" as used in section 86.006(a-1) includes the county clerks' satellite offices and that mail ballots returned to the satellite offices on election day "should be" counted. He explained that they "have continued with our interpretation that Early Voting Clerk's office includes offices of the County Clerk in the county." He also agreed from his perspective that "security was capable of being covered at the satellite offices" during the early voting period because, among other reasons, poll watchers were allowed to observe the process at each location under the October 1 Proclamation. The State Officials, however, did not present evidence to contradict appellees' evidence about the COVID-19 pandemic.

On October 15, the trial court signed the order denying the State Officials' respective pleas to the jurisdiction and granting temporary injunctive relief as follows:

> Plaintiffs' Application for Temporary Injunction is GRANTED, enjoining Defendants, their officers, agents, servants, employees, attorneys, and those inactive concert or participation with them from implementing or enforcing the following paragraph on page 3 of Defendant Abbott's October 1, 2020 Proclamation:
>
> "(1) the voter delivers the marked mail ballot at a single early voting clerk's office location that is publicly designated by the early voting clerk for the return of marked mail ballots under Section 88.006(a-1) and this suspension,"
>
> The limitation to a single drop-off location for mail ballots would likely needlessly and unreasonably increase risks of exposure to COVID-19 infections, and needlessly and unreasonably substantially burden potential voters' constitutionally protected rights to vote, as a consequence of increased travel and delays, among other things.

The State Officials filed their notice of interlocutory appeal on October 19.

**ANALYSIS**

In three issues, the State Officials challenge the trial court's jurisdiction and the temporary injunction. We begin with their jurisdictional issues that challenge the trial court's denial of their pleas to the jurisdiction.

**Plea to the Jurisdiction**

"A plea to the jurisdiction challenges the court's authority to decide a case." *Heckman v. Williamson County*, 369 S.W.3d 137, 149 (Tex. 2012). We review a plea questioning the trial court's subject matter jurisdiction de novo. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–28 (Tex. 2004). We focus first on the plaintiff's petition to determine whether the facts that were pled affirmatively demonstrate that subject matter jurisdiction exists. *Id.* at 226. We construe the pleadings liberally in favor of the plaintiff. *Id.*

If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Id.* at 227; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). When evidence is submitted that implicates the merits of the case, our standard of review generally mirrors the summary judgment standard under Texas Rule of Civil Procedure 166a(c). *Miranda*, 133 S.W.3d at 228; *see also* Tex. R. Civ. P. 166a(c). The burden is on the defendant to present evidence to support its plea. *Miranda*, 133 S.W.3d at 228. If the defendant meets this burden, the burden shifts to the plaintiff to show that a disputed material fact exists regarding the jurisdictional issue. *Id.* We take as true all evidence that is favorable to the plaintiff and indulge

10

every reasonable inference and resolve any doubts in the plaintiff's favor. *Id.* If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact question will be resolved by the fact finder. *Id.* at 227–28. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, however, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

Sovereign immunity from suit deprives a court of subject matter jurisdiction and is therefore properly asserted in a plea to the jurisdiction. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Miranda*, 133 S.W.3d at 225–26. While sovereign immunity bars actions against the state absent a legislative waiver, *Sykes*, 136 S.W.3d at 638, requests for declaratory relief that do not attempt to control state action do not implicate governmental immunity, *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Suits against governmental officials alleging that they "acted without legal authority" and seeking to compel the officials "to comply with statutory or constitutional provisions" fall within the "ultra vires" exception to governmental immunity because they "do not attempt to exert control over the state—they attempt to reassert the control of the state." *Id.*; *see Houston Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 158, 161–64 (Tex. 2016) (discussing ultra vires standard).

**Standing**

In their first issue, the State Officials argue that appellees lack standing. "In Texas, the standing doctrine requires that there be: (1) 'a real controversy between the parties,' that (2) 'will be actually determined by the judicial declaration sought.'" *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005) (quoting *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996)). A plaintiff must therefore be "personally

11

aggrieved" by the defendant's action. *Id.* (quoting *Nootsie*, 925 S.W.2d at 661). The State Officials challenge whether appellees have shown that they were "personally aggrieved." They contend that appellees do not have an actual or imminent injury-in-fact that is fairly traceable to the Governor or the Secretary given that the July 27 and October 1 Proclamations read together expand voting rights and that neither of the State Officials has the authority to enforce the October 1 Proclamation.

The State Officials also challenge the Anti-Defamation League's and Common Cause Texas's organizational or representative standing to bring claims on behalf of their members. We, however, need not analyze the standing of Anti-Defamation League and Common Cause Texas because Knetsch seeks the same injunctive and declaratory relief, and we conclude that he has established his standing. *See Patel v. Texas Dep't of Licensing & Reg.*, 469 S.W.3d 69, 77–78 (Tex. 2015) (explaining reasons behind requirement that only one plaintiff needs to have standing when multiple plaintiffs seek the same injunctive or declaratory relief); *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 6 (Tex. 2011) ("Because the voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required.").

Concerning Knetsch's standing, he is a registered voter in Harris County who is eligible to vote by mail because he is over 65, and he testified at trial about the adverse effect on him of the reduced number of mail ballot return locations under the October 1 Proclamation. At the time of the temporary injunction hearing, he had received his ballot to vote by mail, but he had not decided how he was going to vote. He testified that he had identified one of the Harris County Clerk's return locations to deliver his mail ballot, but the location was no longer available because of the October 1 Proclamation. He also testified about his concerns with

12

mailing his ballot and traveling to the only return location that remains available after the October 1 Proclamation because of the COVID-19 pandemic. He was concerned about "potential congestion at one drop-off location" and his "health risks that [he]'ll be having to expose [himself] to." He explained that his "objective [was] to minimize contact with other people in the process of casting [his] ballot" and, when explaining the burden to him from the proclamation, he testified that he "want[ed] to minimize [his] exposure to other people whether it be voters or poll workers." We conclude that this evidence satisfied the "personally aggrieved" component of standing. *See Lovato*, 171 S.W.3d at 849.

The State Officials also argue that appellees do not have standing because the State Officials are not the parties who are responsible for enforcing the proclamation and therefore are the wrong defendants for this suit. Here, however, appellees are not complaining about the threat of enforcement for non-compliance with the proclamation but the proclamation *itself*, and the proclamation has the force of law. *See* Tex. Gov't Code § 418.012 (stating proclamation has "force and effect of law"). Appellees alleged in their pleadings that the proclamation is unconstitutional and the Governor exceeded his authority in issuing it to the extent it does not allow the County Clerks' multiple return locations under section 86.006(a-1) because, among other grounds, having fewer locations burdens eligible voters' right to vote during the global COVID-19 pandemic and it is early voting clerks who are the designated officials for managing and conducting early voting.

In this context, we conclude that appellees' claims, including ultra vires claims of exceeded authority, have been properly asserted against the Governor, who is the state official who issued the October 1 Proclamation and has the authority to amend it, and the Secretary, who is the chief election officer of the state with enforcement authority. *See id.* § 418.012 (stating

13

that governor may amend proclamation issued under chapter); Tex. Elec. Code §§ 31.001 (designating secretary of state as chief election officer), .003 ("The secretary of state shall obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code."), .005(b) (authorizing secretary to order person to correct offending conduct and seek enforcement of order); *Heinrich*, 284 S.W.3d at 373 (explaining that proper party to ultra vires suit is "state actors in their official capacity" who exceeded authority).

Viewing the evidence under our standard of review, we overrule the State Officials' first issue challenging the trial court's jurisdiction based on the standing doctrine. *See Andrade*, 345 S.W.3d at 10 ("It is not necessary to decide whether the voters' claims will, ultimately, entitle them to relief, in order to hold that they have standing to seek it.").

**Sovereign Immunity**

In their second issue, the State Officials argue that they are entitled to sovereign immunity because appellees do not state a "viable" ultra vires claim. *See id.* at 11 (explaining that government official "retains immunity from suit unless the voters have pleaded a viable claim"). Appellees, however, pleaded facts and presented evidence that support their claims challenging the constitutionality of the October 1 Proclamation to the extent it limits the early voting clerks' statutory authority to accept mail ballots at multiple return locations. Based on our review of the evidence as stated below and our standard of review, we conclude that appellees have stated "viable" ultra vires constitutional claims. *See id.*; *see also Patel*, 469 S.W.3d at 77 ("*Andrade* stands for the unremarkable principle that claims against state officials—like all claims—must be properly pleaded in order to be maintained, not that such claims must be viable on their merits to negate immunity."); *see, e.g.*, *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392

14

(Tex. 2007) (per curiam) (concluding "that the court of appeals did not err by refusing to dismiss the plaintiffs' claims [against the city] for injunctive relief based on alleged constitutional violations"); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (determining that plaintiff whose constitutional rights have been violated may sue state for equitable relief). We overrule the State Officials' second issue.

## Temporary Injunction

In their third issue, the State Officials challenge the trial court's temporary injunction. They argue that appellees did not demonstrate a probable right to the relief sought, nor a probable, imminent, and irreparable injury; that the public interest is disserved by the injunction sought; and that the trial court's chosen remedy is improper.

### Standard of Review and Applicable Law

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). When considering a request for temporary injunctive relief, the question before the trial court is whether the applicant is entitled to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Id.*; *see State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975) (defining status quo as "last, actual, peaceable, non-contested status that preceded the pending controversy"); *Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 882 (Tex. App.—Dallas 2003, no pet.) (noting that underlying merits of controversy are not legal issues before trial court during temporary injunction hearing). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief

15

sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204; *see Southwestern Bell Tel. Co.*, 526 S.W.2d at 528 (explaining that applicant seeking temporary injunction is not required to establish that it will ultimately prevail in litigation).

We review a trial court's order granting temporary injunctive relief under an abuse-of-discretion standard. *See Butnaru*, 84 S.W.3d at 204 (citing *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984)). A trial court abuses its discretion when it acts unreasonably or in an arbitrary manner or without reference to any guiding rules and principles. *See id.* at 211. We will not disturb the trial court's decision to grant injunctive relief absent a clear abuse of discretion. *Reagan Nat'l Advert. v. Vanderhoof Fam. Tr.*, 82 S.W.3d 366, 370 (Tex. App.—Austin 2002, no pet.) (citing *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.)). The scope of review is limited to the validity of the order granting or denying temporary injunctive relief. *See id.* (citing *Walling*, 863 S.W.2d at 58; *Thompson*, 24 S.W.3d at 576). When reviewing such an order, we view the evidence in the light most favorable to the order, indulging every reasonable inference in its favor, and "determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.); *see Thompson*, 24 S.W.3d at 576. "The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision." *Butnaru*, 84 S.W.3d at 211; *see Fox*, 121 S.W.3d at 857 ("A trial court does not abuse its discretion if it bases its decision on conflicting evidence and evidence in the record reasonably supports the trial court's decision.").

Further, our decision today is only a review of "the validity of the temporary injunction order; we do not review the merits of the underlying case." *See Stewart Beach Condo. Homeowners Ass'n v. Gili N. Prop. Invs., LLC*, 481 S.W.3d 336, 343 (Tex. App.—Houston [1st

16

Dist.] 2015, no pet.); *see also Davis v. Huey*, 571 S.W.2d 859, 861 (Tex. 1978) (noting that "review of the entire case on its merits" "far exceed[s] the proper scope of appellate review of a temporary injunction" and "the merits of the underlying case are not presented for appellate review"). With these standards in mind, we turn to the State Officials' challenges to the temporary injunction.

### Trial Court's Temporary Injunction

In its order, the trial court's stated reason for enjoining the October 1 Proclamation's amendment limiting the number of locations to return mail ballots to one per county is as follows:

> The limitation to a single drop-off location for mail ballots would likely needlessly and unreasonably increase risks of exposure to COVID-19 infections, and needlessly and unreasonably substantially burden potential voters' constitutionally protected rights to vote, as a consequence of increased travel and delays, among other things.

*See* Tex. R. Civ. P. 683 (requiring order granting injunction to "set forth the reasons for its issuance"). We turn then to whether appellees showed a probable right to recover on a claim that would support the trial court's stated reasons for granting injunctive relief and a "probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204; *see Fox*, 121 S.W.3d at 857.

"The right to vote is fundamental, as it preserves all other rights." *Andrade*, 345 S.W.3d at 12 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)); *see also* Tex. Const. art. I, § 3 (providing equal rights). But that does not prevent states from regulating the franchise. *Andrade*, 345 S.W.3d at 12 (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). The Texas Supreme Court has applied the federal *Anderson-Burdick* balancing test to evaluate whether an

17

election regulation impinges a fundamental right, considering "'the character and magnitude of the asserted injury'" to the plaintiffs' fundamental right against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *State v. Hodges*, 92 S.W.3d 489, 496 (Tex. 2002) (quoting *Burdick*, 504 U.S. at 434).

The State Officials argue that the challenged portion of the October 1 Proclamation "does not encroach on the right to vote whatsoever," that it "survives any *Anderson-Burdick* review because any burden is miniscule," and that any barriers to voting created by this portion of the proclamation are "incidental." They focus on the multiple options for voting in the upcoming election, the overall impact of the July 27 and October 1 Proclamations that expanded the early voting period and the ability to return marked ballots prior to election day, the State's interests in clarifying the law and ensuring "uniformity in election administration" among early voting clerks, and the lack of a "freestanding right to vote in whatever manner [appellees] deem most convenient." The October 1 Proclamation, however, did not clarify the law by explaining the meaning of "early voting clerk's office" but changed the law to limit the meaning of that phrase to only the singular, contrary to the Attorney General's September 30 representation to the Texas Supreme Court. And the stated reasons in the October 1 Proclamation for amending the July 27 Proclamation were not so expansive; rather, they were "to add ballot security protocols"[6] and to "control ingress and egress to and from a

---

[6] To support their rationale for "ballot security," the State Officials rely heavily on the opinion in *Texas League of United Latin American Citizens*. *See generally* 2020 U.S. App. LEXIS 32211. Our review here, however, is limited to the evidence before us in the interlocutory appeal, applying the applicable standard of review. Whatever the evidence that may have been admitted in that case is not before us and, in this case, the evidence supported a

18

disaster area and the movement of persons and the occupancy of premises in the area." *See* Tex. Gov't Code § 418.018(c).

In reaching its decision to grant the temporary injunctive relief, the trial court reasonably could have credited the evidence that appellees presented, including expert testimony, that supported findings that: (i) the challenged portion of the proclamation was unnecessary for ballot security[7]; (ii) the "ingress and egress" provision of the Texas Disaster Act supported more, not fewer, locations for returning ballots; (iii) the impact from the challenged portion of the proclamation was immediate and irreparable because of the ongoing COVID-19 pandemic, (iv) the general understanding among the parties that the term "early voting clerk's office" in section 86.006(a-1) includes a county clerk's main and satellite offices when the county clerk is the early voting clerk, and (v) the State Officials' position that the October 1 Proclamation does not prohibit local election officials from operating multiple return locations for mail ballots on election day.

The trial court could have credited the evidence that decreasing the number of return locations leading up to election day would significantly increase congestion and wait times at the single designated location in some counties, which in turn would increase the risk of the voters utilizing this method of contracting COVID-19. The trial court also could have

---

finding that increased return locations for mail ballots did not correlate with increased ballot security concerns.

[7] For example, in his report, Cortés concluded that "[f]rom both a security and public perception standpoint," it "does not provide any benefit to limit in-person early voting drop off locations to just one per county." He further concluded: "Limiting drop off locations in the manner described in the Governor's declaration serves no valid election administration or election security purpose." In his report and testimony, he also identified the statutory security measures that were required at each early voting clerk's location.

reasonably inferred from the evidence that the practical impact of the challenged portion of the October 1 Proclamation would be to reduce the number of cast ballots from voters,[8] particularly voters at high risk of serious health concerns, including death, if they contracted COVID-19, and voters from minority communities. Given the COVID-19 pandemic, it is reasonable to assume that voting in person is not a reasonable option for many of the voters who are eligible to vote by mail. *See* Tex. Elec. Code §§ 82.001–.004.

The State Officials focus on the timing of the trial court's temporary injunction "after voting has started." The trial court, however, could have considered the timing of the October 1 Proclamation that was issued after the return of mail ballots at early voting clerk's offices "was already underway." *See In re Hotze*, 2020 Tex. LEXIS 927, at *4 (noting that Harris County Clerk represented that his office would accept mailed-in ballots beginning September 24 and "election [was] already underway"). Additionally, the trial court could have considered that the October 1 Proclamation gave only one day's notice of when it went into effect on October 2 and that some counties had already announced the return locations, for example, Harris County announced the return locations in July. *See id.* Some of the same reasons that the judiciary should be reluctant to interfere in an election that is imminent or ongoing apply equally to the executive branch. *See id.* (observing that "court changes of election laws close in time to the election are strongly disfavored" and explaining in context of denying mandamus relief concerning July 27 Proclamation that it would "disrupt the long-planned election procedures" and "threaten voter confusion"); *see, e.g.*, *Texas League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2020 U.S. App. LEXIS 32211, at *36–38 (Ho, J.,

---

[8] For example, Chatman testified that "tens of thousands" of eligible voters by mail would forgo casting their ballots because of "long lines" and "waiting times" on election day.

concurring) (addressing concerns with unilateral changes to election law by single elected official and observing good reasons for vesting control over election laws in state legislatures).

These concerns are particularly valid in this case where the legislature has designated the early voting clerks as the officials in charge of managing and conducting early voting. *See* Tex. Elec. Code §§ 83.001(c) (stating that early voting clerk generally "has the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting"), .002(1); *see also id.* § 32.071 ("The presiding judge is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves."). And the State Officials affirmatively represent that when the early voting clerk is the county clerk, the "early voting clerk's office" includes the clerk's main and satellite offices and that, on election day, the county clerks may accept mail ballots at their satellite offices. *See* Tex. Gov't Code § 311.012(b) (stating that singular includes plural).

Finally, the State Officials argue that the appropriate remedy would have been to enforce the statute, not eliminate the suspension of the statute. But neither party challenged the July 27 Proclamation before the trial court and, in that context, enjoining the challenged portion of the October 1 Proclamation effectively reinstated the July 27 Proclamation concerning authorized return locations for mail ballots and preserved the status quo of the subject matter of this litigation pending a trial on the merits. *See Southwestern Bell Tel. Co.*, 526 S.W.2d at 528 (defining status quo as "last, actual, peaceable, non-contested status that preceded the pending controversy"); *see also Huey*, 571 S.W.2d at 861 (noting that "review of the entire case on its merits" "far exceed[s] the proper scope of appellate review of a temporary injunction" and "the merits of the underlying case are not presented for appellate review").

21

Viewing the evidence in the light most favorable to the trial court's temporary injunction, we cannot conclude that the trial court abused its discretion. *See Fox*, 121 S.W.3d at 857. We overrule the State Officials' third issue.

## CONCLUSION

For these reasons, we affirm the trial court's order.[9]

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed: October 23, 2020

---

[9] Because the general election is eleven days from today, we direct this Court's clerk to issue the mandate with the release of this Court's opinion and judgment, and we will not consider motions for rehearing. *See* Tex. R. App. P. 2 (authorizing appellate court to suspend rule's operation in particular case to expedite decision or for good cause), 18.6 (authorizing appellate court to issue mandate with judgment in accelerated appeals).

22