Opinion issued September 14, 2021



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00086-CV

————————————

**BRETT BIHNER, Appellant**

**V.**

**BIHNER CHEN ENGINEERING, LTD., BIHNER CHEN ENGINEERING, GP, LLC, AND YUBO CHEN, Appellees**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-81627**

---

## MEMORANDUM OPINION

In this business divorce case, appellant, Brett Bihner, appeals the trial court's order granting a temporary injunction in favor of appellees, Bihner Chen Engineering, LTD., Bihner Chen Engineering, GP, LLC, and Yubo Chen. In two

issues, Brett[1] argues that the trial court abused its discretion in granting the temporary injunction because (1) the record contains no evidence that he misappropriated certain documents and that those documents are protected trade secrets, and (2) the noncompete agreement is unenforceable against him.

We affirm.

## Background

### *The History of the Bihner Chen Entities*

In December 2005, Brad Bihner and Yubo Chen formed a Texas limited partnership called Bihner Chen Engineering, Ltd. ("Bihner Chen") to provide structural engineering services to clients in the greater Houston area and throughout Texas. Brad is Brett's father.

Bihner Chen specialized in low-rise and mid-rise commercial and industrial buildings. Bihner Chen consisted of one general partner, Bihner Chen Engineering GP, LLC, and two equal limited partners, Yubo and Brad, who were licensed engineers, managers, and equal co-owners of Bihner Chen Engineering GP, LLC. At times, we refer to Bihner Chen and Bihner Chen Engineering GP, LLC together as the Bihner Chen entities.

Brad and Yubo executed ten formation documents, including a limited partnership agreement and a noncompete agreement, for Bihner Chen. They made

---

[1] We refer to the individual parties by their first names for clarity.

four copies of all ten documents and placed them in four separate binders. Yubo, Brad, and their respective attorneys received a binder containing identical documents.

Under the noncompete agreement, Yubo paid Brad $38,800 as consideration for Brad agreeing not to compete against Yubo or Bihner Chen for as long as Brad was a partner and for five years after he was no longer a partner.[2] The noncompete agreement prohibited "use in any competition, solicitation, or marketing effort any Confidential Information, any proprietary list, or any information concerning customers of [Bihner Chen]." The noncompete agreement provided that Brad would protect Bihner Chen's confidential information and goodwill. The noncompete agreement reflected Brad's acknowledgment that Bihner Chen owned confidential information, which included:

> pricing information, cost information . . . customer lists, customer leads, documents identifying past, present and future customers, customer profiles and preference data . . . and other confidential, proprietary and/or trade secret information concerning its operations and expansion plans.

Brad and Yubo agreed that the noncompete agreement would "inure to the benefit of and be binding [ ]on [Brad and Yubo] and their respective permitted successors and permitted assigns." Yubo assigned all his "interest, rights, and benefits" under

---

[2]    Yubo also paid Brad $50,000 as consideration for Brad's goodwill.

3

the noncompete agreement to Bihner Chen. In exchange, Bihner Chen credited Yubo's capital account in the amount of $88,000.

### Brett's Interest in the Bihner Chen Entities

About seven years later, Brad decided to retire and wanted to transfer his interest in the Bihner Chen entities to his son, Brett, who was also a licensed engineer. At that time, Brett had been a Bihner Chen employee for many years. Article 8.5 of both Bihner Chen's limited partnership agreement and Bihner Chen Engineering, GP, LLC's regulations granted Yubo the right of first refusal to purchase Brad's interest in the Bihner Chen entities. Yubo waived his Article 8.5 rights and agreed to allow Brad to transfer his rights and interest to Brett. Yubo provided Brett with one of the formation document binders, and Brett did not object to any of the agreements in the binder.

In December 2012, Brett and Yubo entered into a written agreement that Brett would assume all of Brad's rights, title, and interest in the Bihner Chen entities ("written consent"). Under the written consent, Brett agreed to be "bound by all of the governing documents, bylaws, and regulations of [the Bihner Chen entities], as is, without limitation." Unlike his transaction with Brad, Yubo did not give Brett any money. As soon as Yubo and Brett executed the written consent, Brad retired from engineering.

4

Brett assumed his duties as partner and manager of Bihner Chen. Yubo gave Brett access to Bihner Chen's confidential information, including a Christmas card list and a fee schedule. The Christmas card list included Bihner Chen's customers and referral sources, their points of contact, and addresses. It also included handwritten notes about the type and value of gifts Bihner Chen sent to each customer or referral source. Brett kept a copy of the Christmas card list in a manila folder in his office. Yubo did not keep a copy of the Christmas card list. The fee schedule contained information about Bihner Chen's pricing guidelines. Brett and Yubo routinely referred to the fee schedule before bidding on a particular project. Yubo kept a copy of the fee schedule in his office.

### The Buy-Sell Transaction and the Alleged Misconduct

In September 2020, Brett invoked the buy-sell provision of Bihner Chen's limited partnership agreement and Bihner Chen Engineering, GP, LLC's regulations. Under the buy-sell provision, Yubo could either sell his interest in the Bihner Chen entities to Brett for $600,000 or purchase Brett's interest in the Bihner Chen entities for the same price. The next month, Brett and Yubo met at Bihner Chen's office. Yubo presented a letter to Brett and elected to purchase all of Brett's interest in the Bihner Chen entities. The letter outlined the details to finalize the buy-sell transaction and reminded Brett of his obligations and duties to the Bihner Chen entities until the transaction closed. Brett became very angry, announced his

5

immediate resignation from the Bihner Chen entities, and told Yubo that he planned to start a competing business.

Yubo's counsel sent a letter to Brett reminding him of his duties and obligations to the Bihner Chen entities. The letter specifically alerted Brett that starting a competing firm would violate the noncompete agreement. It also stated that Yubo and the Bihner Chen entities would sue Brett and seek injunctive relief if he did so.

Disregarding Yubo's letter, Brett filed a certificate of formation for Bihner Engineering, PLLC before the buy-sell transaction had finalized. The certificate listed Brett as the registered agent, provided his home address as the company's business address, and described the company's purpose as a "professional service" that provided "structural engineering consultation and design services." Brett advertised Bihner Engineering, PLLC on the website for the Texas Board of Professional Engineers & Land Surveyors. He bought an internet domain for Bihner Engineering, PLLC, www.bihner.net. The internet domain Brett bought was much like the internet domain that the Bihner Chen entities held since 2005: www.bihnerchen.net. After Brett had formed Bihner Engineering, PLLC, advertised his company, and bought an internet domain for it, the buy-sell transaction closed and Brett received $600,000 from Yubo in December 2020.

Yubo later learned that the Christmas card list that Brett maintained was missing from his office. He also learned that Brett sent holiday cards to contacts on Bihner Chen's Christmas card list. A former Bihner Chen employee sent Yubo an email informing him that Brett sent him a holiday card and announced his new company. A current Bihner Chen employee also received a holiday card from Brett and sent a picture of Brett's card to Yubo.

Yubo discovered that Brett had solicited one of Bihner Chen's clients. One of Bihner Chen's clients mistakenly emailed Yubo and requested payment for services from Brett's new company, Bihner Engineering, PLLC. The invoice displayed Brett's name and home address. The email and invoice alarmed Yubo because he had paid this client for services days earlier.

Yubo's counsel sent Brett a litigation hold letter requesting written confirmation that Brett would refrain from using "Bihner Engineering, PLLC" as his business name and misappropriating Bihner Chen's trade secrets. The letter underscored Brett's obligation to honor the noncompete agreement.

### *The Lawsuit and Legal Proceedings*

Brett filed a petition against Yubo and the Bihner Chen entities and sought an order declaring that he could use his surname in his new business and that the noncompete agreement was unenforceable against him. He argued that he never executed a noncompete agreement or agreed to be bound by its terms. He also never

7

received any consideration for a noncompete agreement. He requested declaratory relief under Chapter 37 of the Texas Civil Practice and Remedies Code, Texas common law, and the Texas Rules of Civil Procedure. He also requested attorney's fees and court costs.

Yubo and the Bihner Chen entities filed an answer and an application for a temporary restraining order and a temporary injunction against Brett, alleging that Brett breached the noncompete agreement and that he misappropriated Bihner Chen's trade secrets—its Christmas card list and fee schedule—in violation of the Texas Uniform Trade Secret Act ("TUTSA"). *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.001–.008. Yubo and the Bihner Chen entities sought actual, treble, and exemplary damages, attorney's fees, and injunctive relief.

The trial court conducted an evidentiary hearing on Yubo and the Bihner Chen entities' application for temporary injunction. The trial court then entered a temporary injunction, finding that Yubo and the Bihner Chen entities' evidence supported an injunction against Brett for breaching the noncompete and misappropriating Bihner Chen's trade secrets.

This appeal followed.[3]

---

[3] This is an accelerated, interlocutory appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4).

## Temporary Injunction

In his first issue, Brett contends the trial court abused its discretion by granting the temporary injunction.

### A.    Standard of review

We review a trial court's order granting a temporary injunction under an abuse of discretion standard. *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (per curiam). "We will not reverse the trial court's order unless the trial court's action was 'so arbitrary that it exceeded the bounds of reasonable discretion.'" *Midway CC Venture I, LP v. O&V Venture, LLC*, 527 S.W.3d 531, 533 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). A trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Henry v. Cox*, 520 S.W.3d 28, 34 (Tex. 2017). We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence and deferring to the trial court's resolution of conflicting evidence. *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 748 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "We limit the scope of our review to the validity of the [temporary injunction] order, without reviewing or deciding the underlying merits" of the case. *Henry*, 520 S.W.3d at 33–34.

To be entitled to a temporary injunction, the applicant must plead and prove three elements: (i) a cause of action against the defendant, (ii) a probable right to the relief sought, and (iii) a probable, imminent, and irreparable injury in the interim. *State v. Hollins*, 620 S.W.3d 400, 405 (Tex. 2020) (per curiam); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Brett does not challenge the first element. Rather, he asserts that the evidence presented at the temporary injunction hearing does not support the second and third elements: a probable right to the relief sought and a probable, imminent, and irreparable injury in the interim.

## B.     Probable right of relief

Brett claims that Yubo and the Bihner Chen entities did not present any reasonable evidence to establish a probable right of recovery on their trade-secret misappropriation claim. Brett specifically argues that Yubo and the Bihner Chen entities did not prove that the Christmas card list and the fee schedule were trade secrets. Brett also argues that they did not prove that he misappropriated the purported trade secrets.

A plaintiff shows a probable right of success on the merits by alleging a cause of action and presenting evidence that tends to sustain it. *Tel. Equip. Network*, 80 S.W.3d at 607. A plaintiff can establish a claim for trade-secret misappropriation by showing: (1) the existence of proprietary information or a trade secret, (2) a breach of a confidential relationship or improper discovery of the information or secret, (3)

10

unauthorized use of the information or secret, and (4) damages. *RSM Prod. Corp. v. Glob. Petroleum Group, Ltd.*, 507 S.W.3d 383, 393 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

### 1. Trade secret

Brett argues that the Christmas card list and fee schedule did not contain trade secret information because they were retained in his memory and developed from public sources. Moreover, the Bihner Chen entities did not mark the Christmas card list or fee schedule as confidential. Nor did Brett sign any document designating these materials confidential. In response, Yubo and the Bihner Chen entities contend that the evidence supports trade secret protection for the Christmas card list and the fee schedule. At the temporary injunction stage, a trial court does not decide whether the information to be protected is a trade secret. Rather, Yubo and the Bihner Chen entities must establish that they have the right to trade secret protection until a trial on the merits. *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.).

Chapter 134A of the Civil Practice and Remedies Code governs trade secrets. *See* TEX. CIV. PRAC. & REM. CODE § 134A.001. Under TUTSA, a "trade secret" includes

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or

11

list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id*. § 134A.002(6).

At the temporary injunction hearing, Yubo testified that the binder of documents controlled the formation and internal affairs of the Bihner Chen entities. He testified that when he gave Brett the binder of documents and asked him if there were any problems with the existing agreements, Brett told him no. Yubo introduced the noncompete agreement, containing a "Confidential Information" provision that tracks the statutory definition of trade secret:

Bihner acknowledges that Chen and/or the Partnership owns or has developed and will continue to develop unique concepts, sales presentations, marketing programs, marketing strategies, business practices, methods of operation, pricing information, cost information, technical information, proprietary information, computer software programs, tapes and disks concerning its operations systems, customer lists, customer leads, documents identifying past, present and future proprietary and/or trade secret information concerning its operations and expansion plans ("Confidential Information").

The Christmas card list was part of Bihner Chen's marketing strategies, business practices, and customer lists. Yubo testified that the Christmas card list consisted of

12

Bihner Chen's customers and referral sources. Only Yubo and Brett had access to the Christmas card list, and Brett maintained physical possession of the list, which he updated periodically in handwriting to add new client information.

There was also evidence that Yubo and Brett sought to maintain the secrecy of its information. Yubo testified in great detail about the measures undertaken by Bihner Chen to protect the Christmas list and fee schedule from disclosure to its employees and the public. Yubo testified that he and Brett were the only people with access to Bihner Chen's confidential material that was stored on Bihner Chen's server in either a PDF or an Excel file, except for the Christmas list that Brett kept. No other employee knew the credentials to access the server.

The fee schedule contained Bihner Chen's pricing information. Yubo testified that the fee schedule was a one-page document that he and Brett used as a pricing guideline when they bid on projects. Like the Christmas card list, only Yubo and Brett could access the fee schedule. The pricing guidelines were based on the details of the potential job, including the scope of work, the client, and the type of project. Yubo testified that the pricing strategy was confidential.

Yubo and the Bihner Chen entities presented evidence showing that both the Christmas card list and fee schedule were valuable and unavailable to the public. Yubo testified that Bihner Chen considered the information in the Christmas card list and fee schedule valuable because he and Yubo tracked how much business their

13

clients and referral sources generated each year and sent holiday gifts based on the value of the referral. This gift-giving practice was Bihner Chen's key marketing strategy that contributed to its annual gross revenue of $2 million. The Christmas card list contained information about the gifts that Bihner Chen sent the year before and the value of these gifts tracked the volume of work that the client or referral source provided that year. Yubo further testified that Bihner Chen received invitations to bid on projects because of Bihner Chen's marketing strategy, which Bihner Chen used to build rapport with new clients and maintain relationships with existing clients. Finally, Yubo testified that Bihner Chen considered the information on the Christmas card list to be valuable to its own business and would also be valuable to a competitor.

Yubo testified that Bihner Chen considered information about its clients, competition, plans, estimates, and other project information to be confidential. Yubo and the Bihner Chen entities presented Bihner Chen's Employee Handbook as evidence. The section titled "Confidentiality" stated:

> During the course of your employment at Bihner Chen, you will be working with our clients, their competition, future plans, estimates, and other project information that we consider confidential. Maintaining this confidentiality is important to our competitive position in the industry, and ultimately our success and stability. Employees must protect this information by safeguarding it when in use, filing it properly when not in use, and discussing it only with those who have a legitimate business "need to know." Some clients require signing their specific confidentiality agreement. Do not discuss our list of clients

14

outside the office with anyone other than your family. Any work done for Bihner Chen may not be reproduced without permission.

Brett testified that he hired counsel to draft the Employee Handbook and that he reviewed it. Thus, it was undisputed that Brett was aware of Bihner Chen's intention to keep certain information confidential. In fact, Brett testified that, in his dual capacity as a partner and an employee of Bihner Chen, the confidentiality provision, along with the other provisions in the Employee Handbook, applied to him. He conceded that Bihner Chen considered the identity of its customers to be confidential and expected employees, including him, to safeguard that information.

Brett's contention that information committed to memory could not be trade secrets is unavailing. His reliance on *Oxford Global Res., Inc. v. Weekley-Cessnun*, No. CIV.A. 3:04-CV-0330-, 2005 WL 350580 (N.D. Tex. Feb. 8, 2005), is misplaced for two reasons. First, the court did not address whether information committed to memory precluded this information from being a trade secret under TUTSA. *Id.* at *2. Second, the court issued its memorandum opinion in 2005, and TUTSA was enacted many years later in 2013. *See* TEX. CIV. PRAC. & REM. CODE § 134A.001–.008; *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 710–11 n.7 (Tex. 2016). Even before the legislature enacted TUTSA, it has been recognized that "Texas courts . . . do not apply the memory rule." *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

Viewing this evidence in the light most favorable to the order and indulging every reasonable inference in favor of the ruling, Yubo and the Bihner Chen entities presented some evidence from which the trial court could have determined that information in the Christmas card list and the fee schedule deserved trade secret protection until trial. *INEOS Group Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 854–55 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (upholding temporary injunction where company presented some evidence showing that it made great efforts to keep its loop slurry technology confidential); *Fox*, 121 S.W.3d at 859 (concluding pricing information, customer lists, and sales and payroll data were entitled to trade secret protection until trial where plaintiff showed that it did not intend to share information outside its company and it limited access to information); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ) (affirming trial court's order granting temporary injunction where record contained some evidence from which trial court could have determined that information about pricing and customers company sought to protect deserved trade secret protection until trial on the merits).

### 2. Unauthorized use of trade secrets

Brett argues that there was "no reasonable evidence of 'actual' or 'threatened' misappropriation of a trade secret." He also argues that Yubo and the Bihner Chen entities did not present reasonable evidence that he had "acquired, disclosed, or used

either the Christmas card list or the fee schedule." Yubo and the Bihner Chen entities contend that the evidence shows that Brett possessed their trade secret information and could use it.

At the temporary injunction stage, the necessary inquiry is whether the applicant presented some evidence that the non-applicant is "in possession of the [trade secret] information and in a position to use it." *Daniels v. Radley Staffing, LLC*, No. 14-19-00054-CV, 2021 WL 282630, at *5 (Tex. App.—Houston [14th Dist.] Jan. 28, 2021, no pet.) (mem. op.) (citing *Fox*, 121 S.W.3d at 860). "Use of [a] trade secret means commercial use by which the offending party seeks to profit from the use of the secret," and includes "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant" or any reliance on the trade secret to "assist or accelerate research or development." *Berry-Helfand*, 491 S.W.3d at 722. Unauthorized use of a company's trade secret information may be shown by evidence of a former employee using trade secrets acquired during the employment relationship. *See Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). This evidence must show more than just the former employee's "general knowledge, skill, and experience acquired during employment." *Id.*

Here, the evidence shows that Brett had unfettered access to the Christmas card list and the fee schedule. Yubo testified that Brett kept a copy of the Christmas

17

card list and periodically updated it, removing inactive clients and making handwritten notations. Yubo testified that the Christmas card list went missing around the time Brett resigned from Bihner Chen and launched his competitor business, Bihner Engineering, PLLC. The certificate of formation for Bihner Engineering, PLLC shows that Brett started his new company before the before the buy-sell transaction had closed.

Brett testified that he sent "roughly a hundred" holiday cards advertising his competing engineering firm to people he recalled by memory. Brett testified that he acquired addresses of the holiday card recipients through public searches on the internet. He also testified that he had names and telephone numbers of these contacts saved in his phone, which he gleaned from working at Bihner Chen. Yubo testified that some of Bihner Chen's customers and referral sources on Bihner Chen's Christmas card list received Brett's holiday cards. A former Bihner Chen employee sent Yubo an email informing him that Brett had sent him a holiday card announcing his new company. Similarly, a current Bihner Chen employee received a holiday card from Brett and sent a picture of it to Yubo.

The evidence also shows that discovered that Brett solicited one of Bihner Chen's clients. One of Bihner Chen's clients inadvertently attached an invoice to an email and sent it to Yubo. Yubo and the Bihner Chen entities introduced a copy of this invoice into evidence. The invoice identified Brett as the point of contact, Bihner

18

Engineering, PLLC as the company name, and Brett's home address as the mailing address. Brett testified that he established his own relationships with several of Bihner Chen's clients. He also testified that he would "call upon" these companies for business if he could do so. Under these circumstances, the evidence shows that Brett will likely use the information to Yubo and the Bihner Chen entities' detriment.

Viewing this evidence in the light most favorable to the order and indulging reasonable inferences in favor of the ruling, Yubo and the Bihner Chen entities presented some evidence from which the trial court could have determined that Brett had their Christmas card list and might use it. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (holding that appellant possessed former employer's confidential information and could use possibly it, so appellant was likely to use information to former employer's detriment).

Because Brett did not carry his burden of establishing that the trial court's order granting the temporary injunction was an abuse of discretion, we need not address his remaining irreparable harm arguments. *See* TEX. R. APP. P. 47.1; *Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Cap. Cariable*, 527 S.W.3d 492, 503 (Tex. App.—El Paso 2017, no pet.) ("This Court does not need to address every alternative ground stated in an order if one meritorious ground would uphold the entire order."). For these reasons, we overrule Brett's first issue.

19

**Enforceability of Noncompete Agreement**

In his second issue, Brett contends that the noncompete agreement that Yubo and Brad executed was unenforceable because he never signed it or received consideration for a covenant not to compete against the Bihner Chen entities. In response, Yubo and the Bihner Chen entities argue that a dispute about the enforceability of the noncompete agreement is not ripe for appellate review. We agree.

The purpose of a temporary injunction is to "maintain the status quo rather than adjudicate the matter on the merits." *In re M-I L.L.C.*, 505 S.W.3d 569, 576 (Tex. 2016). At a temporary injunction hearing, the trial court only addresses the legal issues related to whether the applicant showed a probability of success and irreparable injury. *Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.) (op. on reh'g). The merits of the controversy are not at issue at the temporary injunction stage of the legal proceedings. *Id.*; *Thomas v. A\*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at \*8 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.). Because the merits of the controversy are not before the trial court at temporary injunction hearings, a trial court does not address the ultimate issue of whether a covenant not to compete is enforceable under Section 15.50 of the Business and Commerce Code. *Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 884–85 (Tex. App.—Dallas 2003, no pet.). Rather, a

20

determination of "[t]hat issue awaits a final judgment on the merits, such as a final judgment entered after a jury or bench trial or a hearing on a motion for summary judgment." *Id.* at 885. Thus, a trial court's order granting a temporary injunction does not declare that a covenant not to compete is valid. So an interlocutory appeal from an order granting a temporary injunction based on a covenant not to compete does not present the ultimate issue of whether the covenant is enforceable. *Loye*, 156 S.W.3d at 619 (citing TEX. BUS. & COM. CODE § 15.50); *Cobb*, 109 S.W.3d at 882– 83. A determination of whether the noncompete agreement is enforceable must await a final judgment on the merits. *See Cobb*, 109 S.W.3d at 885; *Thomas*, 2020 WL 5269412, at *8.

For these reasons, we will not consider whether the noncompete agreement is enforceable against Brett. That determination must await a final judgment on the merits. *See Smith v. Livingston Hearing Aid Ctr., Inc.*, No. 07-06-0204-CV, 2006 WL 2686623, at *1–2 (Tex. App.—Amarillo 2006, no pet.) (mem. op.) ("[I]f the trial court cannot use the interim procedure to resolve the merits of the underlying claim, neither can the reviewing court . . . by arguing that the covenant at bar fails to comport with § 15.50 of the Business and Commerce Code, Smith posits a contention which we cannot permissibly resolve via an appeal from an order granting a temporary injunction.").

21

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Chief Justice Radack and Justices Landau and Countiss.